13445

HICKMAN v. AETNA LIFE INS. CO. OF HARTFORD, CONN.

(164 S. E., 878)

*Messrs. J. E. Edens* and *J. S. Verner,* for appellant, ■

*Messrs. McKay & Manning,* for respondent.

July 7, 1932.

The opinion of the Court was delivered by MR. JUSTICE STABLER.

This action was brought in the County Court for Richland County by a certificate holder insured under a group policy of insurance taken out by the Pacific Mills with the defendant company upon certain of its employees; the certificate being issued subject to the terms and conditions of the policy and for the sum of $1,000.00 We quote here the following pertinent provisions of the contract: "If any employee, before attaining the age of sixty years and while insured hereunder, becomes totally disabled and presumably will thereafter during life be unable to engage in any occupation or employment for wage or profit  *  *  *  such employee shall be deemed to be totally and permanently dis-

abled. Upon receipt at the home office of the insurance company, during the continuance of insurance on such employee, of satisfactory evidence of such disability, the insurance company will waive further payment of premium for the insurance upon the life of such employee and in lieu of all other benefits provided for on such life under this policy, will pay the amount of insurance in force upon such life at the time such disability commenced."

The plaintiff alleged that, while the insurance was in full force and effect, she "became totally and permanently disabled as a result of heart trouble, high blood pressure, kidney trouble, pellagra and loss of mental faculties," and that since September 1, 1929, she has been unable to engage in any occupation or employment for wage or profit, and will be totally disabled for the rest of her life. The answer of the company was in effect a general denial. On trial of the case, July, 1931, the Court directed a verdict for the defendant on the ground that there was no evidence that the plaintiff was totally and permanently disabled prior to the cancellation of her certificate of insurance. From this order the plaintiff appeals.

One question only is presented for our consideration: Did the trial Judge commit error in directing the verdict?

The meaning of the words "total permanent disability," as used in contracts of insurance such as the one before us, has been considered by this Court in a number of cases.

In *Taylor v. Insurance Co.*, 106 S. C., 356, 91 S. E., 326, L. R. A., 1917-C, 910, it was held that in an insurance policy of this kind a person is "deemed totally disabled when he is no longer able to do his accustomed task, and such work as he has only been trained to do, and upon which he must depend for a living."

In *Berry v. Insurance Co.*, 120 S. C., 328, 113 S. E., 141, 142, the Court quoted the following with approval: "The rule prevailing in most jurisdictions is that the 'total disability' contemplated by an accident insurance policy does

not mean, as its literal construction would require, a state of absolute helplessness which can result only from loss of reason, since as long as one is in full possession of his mental faculties he is capable of transacting some part of his business, whatever it may be, although he is incapable of physical action. On the contrary, these Courts, giving consideration to the object of the contract, hold that the 'total disability' contemplated by the agreement is inability to do substantially all of the material acts necessary to the prosecution of the insured's business or occupation, in substantially his customary and usual manner."

In *Brown v. Insurance Co.*, 136 S. C., 90, 134 S. E., 224, 225, the following is quoted from 14 R. C. L., 1316: "If the prosecution of the business required the insured to do several acts and perform several kinds of labor, and he is able to do and perform one only, he is as effectually disabled from performing his business as if he were unable to do anything required to be done, and while remaining in that condition he suffers loss of time in the business of his occupation. Nor does the provision contemplate absolute physical disability to transact any kind of business pertaining to one's occupation, but it is sufficient if his injuries are such that common care and prudence require him to desist from transacting any such business in order to effect a cure." See also, *McCutchen v. Life Insurance Co.*, 153 S. C., 401, 151 S. E., 67; *Gresham v. Aetna Life Insurance Co.*, 159 S. C., 326, 156 S. E., 878; *Davis v. Life Insurance Co.*, 164 S. C., 444, 162 S. E., 429, three recent decisions in which this Court sanctioned and approved the construction given the term in the earlier cases.

With these principles in mind, we now turn to an examination of the evidence in the case at bar. The certificate of insurance was issued in February, 1927, and was canceled on October 28, 1929. The plaintiff testified that she was 39 years old and a widow with four children; that she had been in the employ of the Pacific Mills about

six or seven years and had worked that entire time as a spooler in the mill, with the exception of about eight months in the cloth room; that she quit the mill in April or May, 1930, for the reason that she was "entirely disabled to work"; that, although she had been sick for about three years, she had gone on as long as she could, working only a part of the time during the last two years, as she had four children to support.

Dr. Roof, a witness for the plaintiff, testified that he had known the plaintiff for about four years; that he had treated her while she was working at the Pacific Mills; and that the first time that he saw her was in the winter of 1927-1928. He further testified:

"At that time she had a high blood pressure, a chronic kidney condition and a nervousness which I attributed to the high blood pressure. Then the next time I saw her was in the spring of 1928, and off and on, at varying intervals, straight on up until I wasn't city physician any more. During that time she had pellagra, high blood pressure and myocarditis.

"Q. Myocarditis means what? A. Enlarged heart, and a chronic nephritis.

"Q. And that means what? A. Chronic kidney trouble.

"Q. In your opinion is that woman at the present time, or has she been for the time that you have known her able to engage in mill work? A. She has been what I would call totally disabled since the first time I ever saw her.

"Q. Do you think she will be that way the rest of her life time or do you think she will get well? A. She will be that way the rest of her life."

Dr. Adcock, who also was a witness for the plaintiff, stated that he had known her about five months, during which time he had treated her, and testified as follows:

"Q. Would you mind telling her condition? A. Her condition has been since I have seen her, she has had a high blood pressure, a myocarditis, she has present a symptom of pel-

lagra, her arteries are also somewhat hardened, and she has chronic nephritis, a kidney condition.

"Q. In your opinion is she disabled from carrying on her work as a mill worker? A. She is disabled absolutely.

"Q. Do you think she will be disabled for the rest of her life? A. There is no question of it in my mind. * * *

"Q. In your opinion how long would you say she has been suffering with this trouble? A. There is certainly no way for me to be absolutely sure. and accurate about that. It is perfectly impossible. You can see that I cannot be very accurate, but I don't see with this hyper-tension and the result from her condition, how it could come on under say a year or two, at least. You certainly wouldn't see it under that time and I suspect that it goes back further than that time."

Mrs. Ada Love also testified that she had known the plaintiff for about seven years, and that she had been sick "off and on for the last three years." When asked to describe briefly what condition plaintiff had been in and what witness had seen, she replied: "She would go to the mill and work and come out and sometimes she would work a week and sometimes she would be out and come home sick and send for me and I would go there and she would be nervous and looked like her eyes glittered, she would scare me sometimes when I would come in and look at her and I have been over there when she would be so nervous she couldn't hardly talk and I would wait on her and she has called me 12 o'clock at night to come to her house when I would be asleep. She would send someone for me."

Counsel for appellant contends that the testimony made an issue of fact for the jury as to the question of plaintiff's total disability prior to October 28, 1929, the date of the cancellation of her certificate of insurance; and that the fact that she did some work "off and on," as she testified, for several months after that date, did not, under our decisions, justify a directed verdict for the defendant.

Upon careful consideration of the entire evidence, we are inclined to the view that the trial Judge was correct in his holding. The plaintiff alleged that she became totally disabled on or about September 1, 1929, a few months before the cancellation of her insurance. Dr. Roof testified that he saw her for the first time in the winter of 1927-1928, and that she was then "what I would call totally disabled." Exactly what he meant by that expression is not clear. The Court will assume, in the face of certain physical facts, that he did not intend to imply that she was reduced to a state of utter helplessness; he clearly had in mind some less strict standard of total disability. If he meant, however, the language used to have the significance given to the expression "total permanent disability" by this Court in its construction of that term as used in insurance contracts of this kind, then the admitted fact that plaintiff continued to do her customary work in the usual manner, though perhaps intermittently, for several years thereafter, shows his statement to be absolutely erroneous. In other words, in the face of this fact, the statement of the witness was a mere assertion or expression of opinion of no probative value, and could not create an issue of fact as to plaintiff's total disability. As we have said, the testimony showed that plaintiff continued to do the work she had been doing all the while, substantially in the usual manner, though irregularly, to the date of her resignation in April or May, 1930. In fact, this is the only inference to be drawn from her testimony, as she declared that she was never discharged but quit work voluntarily, when she did stop, on account of her health. While it appeared that plaintiff was seriously afflicted, there was no evidence upon which the jury could have predicated a finding that she was "totally disabled," under the Court's construction of that term as used in a policy of this kind, before or at the time of the cancellation of her insurance.

The judgment of the lower Court is therefore affirmed.

Mr. Chief Justice Blease and Mr. Justice Bonham concur.

Mr. Justice Carter concurs in result.