MRS. FLOYE MYRTLE THIGPEN v. JEFFERSON STANDARD LIFE
INSURANCE COMPANY.

(Filed 19 April, 1933.)

1. Trial D a—

On a motion as of nonsuit the evidence is to be considered in the light most favorable to the plaintiff. C. S., 567.

2. Insurance R c—

Whether an insured has suffered disability within the meaning of a disability clause in a life insurance policy is ordinarily a question for the jury, but where facts are admitted which establish that the insured had not suffered disability as defined by the policy the question is for the court.

**3. Same—Action to recover on disability insurance held properly non-suited on admission that insured received $40.00 a month as court crier.**

In order for an insurer to be liable on a clause in a life insurance policy providing for the payment of a certain sum monthly in case the insured should become "wholly and continuously disabled . . . and wholly prevented thereby from pursuing any occupation whatsoever for remuneration or profit" the insured must suffer a disability preventing him not only from pursuing his usual employment but any other regular employment, and where in an action on the disability clause the plaintiff admits that the insured received $40.00 a month as court crier during the term of the alleged disability, the defendant's motion as of nonsuit is properly allowed.

CIVIL ACTION, before *Grady, J.,* at January Term, 1933, of PITT.

On 18 April, 1922, the defendant issued to Alexis Lawrence Thigpen its policy of life insurance for $2,000, in which the plaintiff, wife of the insured, was named as beneficiary. The policy contained total and permanent disability provisions, together with a clause waiving the premium in the event of described disability. The disability clause in controversy is as follows: "Or that he has been wholly and continuously disabled by bodily injuries or disease other than mental, and will be permanently, continuously and wholly prevented thereby from pursuing any occupation whatsoever for remuneration or profit."

The insured died on 10 June, 1932, at the age of fifty-three years. No proofs of disability were ever filed and no demand made for such benefits until after the death of the insured. The evidence tended to show that about 1 October, 1929, the deceased suffered a stroke of paralysis and that his health gradually declined. He suffered a second stroke in December, 1931. The policy of insurance was found after his death "in an old shed room in an old drawer" where the deceased kept some papers. On 20 February, 1929, the deceased borrowed from the defendant company on said policy the sum of $318.00 and executed and delivered a note therefor upon the prescribed form. The plaintiff joined in the execution of the note. On 18 March, 1930, the insured executed a policy lien note upon the policy for $48.00. Neither the insured nor any person for him paid the annual premium on the policy of insurance maturing on 18 April, 1930, nor was such premium paid within the grace period of thirty days thereafter.

The defendant alleged that the policy lapsed on 29 May, 1930, by reason of failure to pay the premium, and furthermore, that neither the plaintiff, beneficiary, nor the insured had at any time given the defendant any notice of disability as provided by the terms of the policy.

The testimony offered by the plaintiff and her witnesses tended to show that after the insured suffered the first stroke of paralysis in 1929,

that he was mentally and physically unable to attend to his farm or to do any other work whatever, or to give notice of disability. The plaintiff, beneficiary, said: "Mr. Thigpen was not able to look after the farm. He didn't have the strength and didn't have the mind to do anything at all. That's why we left the farm. When we moved from the farm into town my daughter and I looked after everything. . . . He had to execute a crop lien in 1932, but he didn't know any more what he was doing than anything in the world. . . . I don't know whether he had mind enough on 18 March, 1930, to request a loan on his policy to keep it in force. (Witness is shown a note for $318.00 payable to the defendant, signed by the insured and the plaintiff.) He signed it, but didn't know what he was signing. That is my husband's signature on the paper." The daughter of the insured testified: "He came to Greenville to live with my husband and myself in January, 1932, and moved back to the farm in May, just a little while before he died. . . . I didn't know that my father had this policy. . . . If I had known that these provisions existed in this policy, I would have made application for the benefits when he first became affected in October, 1929. . . . He gradually grew worse all the time. . . . He knew me. He didn't have mind enough to tell his tenants what to do. . . . I attended to the marketing and selling of the tobacco grown on my father's land in 1930 and 1931, because he was not able to attend to it." A brother of the insured said: "I know that my brother did not have sufficient mental capacity on and after 18 April, 1931, up until his death, to know and understand the provisions in this insurance policy and its scope and effect, or he would certainly have collected it." A physician, testifying.for the plaintiff, said that he saw the insured in October, 1929, "and that at the time he had high blood pressure, a chronic Bright's disease, and hardening of the arteries. . . . I knew that his vocation was farming. His physical condition would certainly have prevented him from taking any part in the work on the farm. Mr. Thigpen's condition, as I found it, prevented him from fitting himself for any other vocation. . . . He knew me. He told me his symptoms, how his head hurt, how he had dizziness and all the symptoms, the usual symptoms which a man with high blood pressure and that type of Bright's disease has. . . . He paid me in cash. He knew a $5.00 bill from a $10.00 bill. From time to time he did pay me for services rendered. His condition had changed mentally to some extent, and he had fallen into a sort of fantastical and don't-care attitude." Another physician testified that the insured "had a cerebral hemorrhage which had produced a paralysis of the rectus muscle; that he gradually thereafter grew worse in body and mind; that thereafter he was unable to follow his vocation and unable to perform with sub-

stantial continuity the duties incident to such vocation; that he suffered lapse of memory; that his entire mentality was changed."

The undisputed evidence for plaintiff also disclosed the following facts: (1) The insured served as tax lister for Belvoir Township for the years 1930 and 1931. He signed some of the lists, although his wife and daughter testified that they looked over them to see if they were correct and frequently made changes therein. (2) He drove an automobile, although a witness said that on one occasion the insured had forgotten how to shift the gears. (3) He was a member of the public school board for at least two years preceding his death. (4) He was appointed court crier for the county court on 1 January, 1932, and held the position until a few days before his death in June, 1932, and received for his services a salary of $40.00 per month. There was much evidence that the insured was not able to perform the duties of court crier; that frequently other persons performed such duties for him, although he was always present at his post of duty.

There was much evidence in behalf of defendant from physicians and neighbors tending to show that the insured was an intelligent man and able to carry on conversation about the general happenings of the day. Witnesses were offered, who testified that they had listed taxes while the deceased was tax lister, and that he attended meetings of the school board, discussing with other members thereof matters relating to the school. A farmer and minister and neighbor of deceased testified that the insured attended the meetings of the school board in 1931, and took part in discussions relating to the election of the principal of the school and other business matters, and that "his mental condition seemed to be all right except his legs, and he did not look right out of his eyes."

At the conclusion of the evidence the trial judge entered a judgment of nonsuit and the plaintiff appealed.

*Albion Dunn for plaintiff.*
*Brooks, Parker, Smith & Wharton for defendant.*

BROGDEN, J. If an insured receives $40.00 per month for services as court crier, is he entitled to recover upon an insurance policy providing disability in the event "that he has been wholly and continuously disabled by bodily injuries or disease other than mental, and will be permanently, continuously, and wholly prevented thereby from pursuing any occupation whatsoever for remuneration or profit?" Stripping the proposition to the bone, does the receipt of $40.00 per month for services constitute an occupation "for remuneration or profit?"

There is abundant evidence that the insured, a farmer, suffered a stroke of paralysis in 1929, and as a result thereof both his body and

mind were seriously impaired to such an extent that he was wholly unable to attend to his farm or to perform any physical labor whatsoever. Although there was a sharp conflict in the evidence, notwithstanding upon a judgment of nonsuit, the evidence for plaintiff must be construed in its most favorable light.

The interpretation of the meaning of the words in the policy or words of like import has produced a wide divergence of opinion among text-writers and courts of last resort. Similar language was construed by the Supreme Court of Tennessee in *Pacific Mutual Life Insurance Company v. McCrary,* 32 S. W. (2d), 1042. The Court said: "The phrase 'total disability' has a well understood meaning in the law of insurance. It does not mean a state of absolute helplessness. The decisions, almost without conflict, define that condition as an inability to do the material acts necessary to the prosecution of insured's business or occupation (and substantially all the material acts) in (substantially) his usual or customary manner. Cases so holding are too numerous to be set out." See, also, *Metropolitan Life Insurance Co. v. Lambert,* 128 Southern, 750. The logic of these decisions is that such contracts undertake to insure the usual and customary occupation of the policyholder, or, at least, that the insured shall at all times be reasonably qualified physically and mentally to perform the material duties of his present occupation. Courts adopting a different view proceed upon the theory that contracts are made by the parties and not by the judges, and that if the words creating or eliminating liability are clear, plain, and unambiguous, the contract must be enforced according to its terms.

Notwithstanding the views of courts in other jurisdictions or the power and persuasiveness of the reasoning, this Court has spoken upon this type of contract. Thus, a farmer procured a policy, providing disability benefits in language practically identical with that contained in the policy now under consideration. See *Lee v. Ins. Co.,* 188 N. C., 538, 125 S. E., 186. The trial judge charged the jury as follows: "Now, you will want to know what is meant by the language in the contract 'wholly incapacitated and thereby permanently and continuously prevented from engaging in any avocation whatsoever for remuneration or profit' It does not mean merely that this disability may incapacitate him from pursuing his usual avocation, from working on his farm with his hands, but that it must incapacitate him from engaging in any avocation for remuneration or profit. . . . Our courts hold that the act shall be in force as it reads and that the insured cannot recover because totally disabled for his own trade or business, if he retains health, strength and physical ability sufficient for the pursuance of other avocations by which he might engage for profit or remuneration." The *Lee case* was submitted to the jury, but it is to be noted that there was

no evidence in the record that the insured actually received money for performing the acts described in the evidence. See, also, *Buckner v. Ins. Co.,* 172 N. C., 762, 90 S. E., 897; *Brinson v. Ins. Co.,* 195 N. C., 332, 142 S. E., 1; *Metts v. Ins. Co.,* 198 N. C., 197, 151 S. E., 195; *Bulluck v. Ins. Co.,* 200 N. C., 642, 158 S. E., 185. The interpretation adopted by this Court is supported by the following declaration in 6 Cooley's Briefs on Insurance, page 5548: "The provision may limit total disability to the inability to carry on any and all kinds of business. Under such a clause the insured must be unable to perform not only the duties of his usual occupation, but the duties of any other occupation." See *Hurley v. Bankers Life Co.,* 37 A. L. R., p. 146, and Annotation; *Metropolitan Life Ins. Co. v. Bovella,* 51 A. L. R., 1048; *Mo. State Life Ins. Co. v. Snow,* 47 S. W., 600; *Metropolitan Life Ins. Co. v. Wann,* 28 S. W. (2d), 196; *Du Rant v. Ætna Life Ins. Co.,* 164 S. E., 881.

The ultimate question is whether the infirmities and disabilities of the insured wholly prevented him "from pursuing any occupation whatsoever for remuneration or profit." Must such a question be submitted to a jury, or upon admitted facts, is it a question of law for the court? Ordinarily, such questions must be submitted to a jury, but in the case at bar it is admitted that from January until June, a few days prior to his death, the insured received $40.00 per month as compensation for his services as court crier for the county court of Pitt County. It is true that physicians and many other prominent citizens of the community testified that the insured was neither physically nor mentally capable of discharging such duties. Nevertheless it is beyond question that the services of the court crier were satisfactory to the public authorities, because they actually paid him his monthly stipend of $40.00. The law is designed to be a practical science, and it would seem manifest that a plain, everyday fact, uncontroverted and established, ought not to be overthrown by the vagaries of opinion or by scientific speculation.

A somewhat similar situation developed in the case of *Hickman v. Life Ins. Co.,* 164 S. E., 878. The physician testified that the plaintiff had high blood pressure, a chronic kidney condition, and a nervousness attributable to high blood pressure. Furthermore, she had pellagra and myocarditis. The physician also testified that she was totally disabled. However, the evidence disclosed that the insured continued to work in the mill intermittently for several years thereafter. The South Carolina Court, referring to the testimony of the physician, said: "Exactly what he meant by that expression is not clear. The Court will assume, in the face of certain physical facts, that he did not intend to imply that she was reduced to a state of utter helplessness; he clearly had in mind some less strict standard of total disability. If he meant, however, the

language used to have the significance given to · the expression 'total permanent disability' by this Court in its construction of that term as used in insurance contracts of this kind, then the admitted fact that plaintiff continued to do her customary work in the usual manner, though perhaps intermittently, for several years thereafter, shows his statement to be absolutely erroneous. In other words, in the face of this fact, the statement of the witness was a mere assertion or expression of opinion of no probative value, and could not create an issue of fact as to plaintiff's total disability."

Upon a consideration of the entire record, the Court is of the opinion that the trial judge ruled correctly.

Affirmed.