### 14216

THOMPSON v. EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES

(183 S. E., 715)

*Messrs. Thomas, Lumpkin & Cain* and *McDonald, Macauley & McDonald*, for appellant,

*Messrs. Martin & Sturkie* and *Douglas & Douglas*, for respondent,

February 4, 1936.

The opinion of the Court was delivered by MR. JUSTICE CARTER.

This suit, by Leslie Thompson, as plaintiff, against the Equitable Life Assurance Society of the United States, de-

fendant, commenced in the Court of Common Pleas for Fairfield County, February 2, 1934, is an action to recover judgment against the defendant in the sum of $2,000.00, alleged to be owing and due the plaintiff under a certificate of insurance issued by the defendant to the plaintiff, on account of his alleged total and permanent disability which, according to plaintiff's allegations, resulted from the loss of his right eye and attendant nervousness, etc. By the answer filed in the cause by the defendant the defendant admitted the execution and delivery of the certificate in question but denied that the plaintiff was then or had been during any of the times he was in the employ of the mills in question, or while the said certificate was in force and effect, "so wholly disabled by bodily injury or disease so as to be wholly and permanently presumably prevented thereby for life from performing any and all gainful occupation." Further, the defendant alleged that in the exercise of the right reserved to the employer the amount of the said certificate had been reduced on the 1st day of June, 1933, from $2,000.00 to $1,000.00.

The case was tried at the spring, 1934, term of said Court before his Honor, Judge P. H. Stoll, and a jury, and resulted in a verdict for the plaintiff in the sum of $2,000.00, the face amount of the said certificate of insurance. From the judgment entered on the verdict, the defendant has appealed to this Court, and seeks a reversal of the judgment in the lower Court upon the exceptions which we shall discuss.

The allegations of error which the appellant imputes to the trial Judge are set forth under four exceptions, but, in appellant's brief presented to this Court, appellant states that there are only three questions involved in the appeal, to wit:

"1. Was the evidence offered by the plaintiff sufficient to show that the plaintiff was incapacitated from doing substantially all material acts necessary to the prosecution of his business in substantially his usual and accustomed manner?

"2. Did the trial Judge err in refusing to grant a nonsuit or direct a verdict in favor of the defendant when it was established by the evidence that the plaintiff had performed his duties in his usual and customary manner for a period of seven months after he had lost his right eye and then voluntarily discontinued his work?

"3. Did the trial Judge err in refusing to grant a new trial where the only reasonable inference to be drawn from the testimony was that the insured was not totally and permanently disabled and the verdict of the jury was against the overwhelming weight of the testimony and in disregard of the instructions given by the Court?"

Stated in a more concise way, the appellant contends that the trial Judge committed error of law in denying the motions for a nonsuit, direction of a verdict, and a new trial, respectively, there being, according to appellant's contention, no evidence to take the case to the jury on the question of total and permanent disability of the plaintiff. These questions we shall discuss jointly.

According to plaintiff's allegations, the defendant, on or about the 1st day of May, 1926, issued and delivered to the United States Rubber Company, a corporation, "its certain group policy or contract of insurance, bearing that date and numbered 2127, whereby it agreed to insure the lives of certain employees of the said United States Rubber Company, for a term of one year, and in which policy it is provided that said policy shall be automatically renewed, annually, upon the payment of the premium therein fixed, and which policy of insurance is now and has since the date thereof been in full force and effect, and by endorsement thereon it was agreed by the defendant that from the 1st day of January, 1931, the said policy was extended to cover the lives of the employees of the Winnsboro Mills, a corporation doing business in Fairfield County, South Carolina, which is under the control, management and ownership of the said United States Rubber Company."

The plaintiff further alleges "that said policy of insurance provides, in substance, that the defendant will issue to the employer for delivery to the employee whose life is insured under said policy, an individual certificate, setting forth a statement as to the insurance protection to which such employee is entitled under the terms of said policy, and to whom it is payable and pursuant to the terms of said policy, on the 1st day of January, 1931, the defendant delivered to the plaintiff, through Winnsboro Mills, by whom plaintiff was employed an individual certificate numbered 2127-A-27734, bearing that date, under and by which, subject to the terms and conditions of said policy, the defendant insured the plaintiff's life for the sum of Two Thousand ($2,000.00) Dollars." As stated above, the defendant, in its answer, admitted the execution and delivery of the policy in question, but alleged that it was thereafter reduced from the sum of $2,000.00 to $1,000.00, in the exercise of the right reserved to the employer thereunder.

The plaintiff further alleged "that it is provided in said policy of insurance and in said individual certificate, in substance, that if proof shall be furnished the defendant that any employee insured under said policy has before attaining the age of 60 years, become wholly disabled and presumably permanently prevented thereby for life from pursuing any and all gainful occupation, the defendant will pay six months after receipt of such proof the full amount of insurance on such life either in a single sum or at the option of the employer equivalent thereof in a fixed number of annual installments."

It is further alleged by the plaintiff "that plaintiff is now 37 years of age, and on or about the 10th day of August, 1932, while in the employ of the Winnsboro Mills he lost the sight of one eye, and since that date he has been unable to engage in his usual occupation in substantially his accustomed manner, and on account of his physical condition is totally and presumably permanently prevented thereby

for life from pursuing any and all gainful occupation and is totally and permanently disabled."

The plaintiff further alleges "that the plaintiff has performed all conditions precedent as required in and by the terms and provisions of said policy or contract of insurance, and there are now due him under the terms and provisions of said policy Two Thousand Dollars with interest thereon from the 10th day of August, 1932, payment of which the defendant has refused and declined to make."

In response to these allegations, the plaintiff introduced testimony tending to establish the same, and, in our opinion, the testimony thus introduced was sufficient to take the issues raised by the pleadings to the jury. For this reason, we think the trial Judge properly overruled the above stated motions.

The plaintiff, Leslie Thompson, during the course of his testimony stated, in effect, that he began work in the Winnsboro Mills when about 20 or 21 years of age. He worked with machinery in the said mills and was known as a section hand or fixer. It was his duty to inspect the machinery in what is known as the twister room and to see that the machines in that room were in proper condition and to adjust and repair the machinery therein. He was to see that the said machinery was operating and manufacturing the material properly. The plaintiff further testified that he had been trained for doing this kind of work and was fitted for this work, but had not been trained and was not fitted for any other occupation. On the 10th day of August, 1932, he lost his right eye and was totally blind in that eye. Following this accident the plaintiff remained in the hospital until the 27th day of October of the same year. On getting out of the hospital, being anxious to resume his former work, he tried to do the work as before, but on account of the injury he suffered from headache and nervousness and was forced on about the first of May, 1933, to give up the work, being unable to carry it on. In this connection, we quote from plaintiff's testimony at the trial, as follows:

"Q. What happened to you in the mill, Mr. Thompson? A. Well, I lost my eye.

"Q. Which eye? A. The right.

"Q. When did that happen? A. Happened on the 10th of August, 1932.

"Q. And what happened after that? A. Well, I went to work and saw—I went to work and went to try to run my job, and it grew worse and worse with me all the time; I couldn't see. I stayed under a strain; and I just couldn't keep up with the job and all the strain I had; and I just found it so I couldn't run it no longer and I quit.

"Q. Why couldn't you run it? A. Well, I couldn't see to run it. My nerves went bad on me, and I just couldn't make it with the machines, the work I had to do.

"By the Court: How were your nerves before you lost your eye?

"Witness: They were good. * * *

"Q. Now, state about your vision in doing the work, what about your vision, your sight? A. Well, I saw—I go to look at anything, I look at it and it all runs together; and I just can't see how to do my work and do the inspecting that I have to do."

The plaintiff, according to the record, began work at the mill in question September or October, 1920, and continued his work there until he was injured, and, in describing his condition testified as follows: ·

"Q. State whether or not you were ever trained for any other occupation? A. No, sir; I wasn't. * * *

"Q. What physical disability did you have? A. Well, my nerves were gone.

"Q. Well, was there any particular part of your body becoming impaired—what was it? A. My nerves and my stomach. * * *

"Q. Now, did you have to work on those machines while they were standing still or while they were running? A. There were times I had to work on them while they were

standing still; and times while they were running, in order to get them brought true.

"Q. To what extent would you have to see when you were working on them? A. You have to see how to change gears. You go under those machines to put in cylinders; to set rails.

"Q. Now that was your job; to repair those? A. Yes, sir; to keep those in shape. If they broke down I had to fix them. And a lot of times I had to run a machine to find the trouble —run a machine and hunt the trouble. * * *

"Q. You did work for some time and did finally give up? A. Yes, sir."

With reference to the injury of plaintiff and the effect such injury had upon the plaintiff in the performance of the work in question, Dr. Mikell testified, in part, as follows:

"Q. Did you ever examine the plaintiff Thompson in this case? A. Yes, sir.

"Q. When did you examine him? A. Yesterday.

"Q. What did you find to be his condition, doctor? A. I found that one eye was blind; and he has got some slight diminution of vision in his uninjured eye.

"Q. Doctor, you have heard his testimony here as to the nature of his employment, as to the kind of work he had to do, I will first ask you what effect did the loss of that eye have on him? A. Well, in losing one eye of course he lost the power of seeing with two; he loses his bifocal vision; and in so doing he naturally loses his sense—his judgment of distance, that one-eyed people do, because two eyes to better judge distance—his direction is all right, but he has lost a good part of his power of judging distance. * * *

"Q. I ask you this then, doctor, after losing one eye is it more or less fatiguing to him to do his work than if he had two eyes? A. Yes, sir; a man that is doing work that calls for close observation, and continually watching a thing with one eye he will naturally fatigue much more easily and get tired sooner than a man with two, and that is particularly

true of a man that loses an eye later in his life, when he has been accustomed to two eyes. * * *

"Q. So, what effect, doctor, would the loss of that eye have on his nervous system? A. Well, when using one eye altogether it would have considerable effect upon his nervous system. * * *

"Q. By the Court: The indigestion might be caused by the nervousness, or nervousness from indigestion? A. Yes, sir; nervousness might cause indigestion and stomach trouble.

"Q. Will nervousness cause indigestion, too? A. Yes, sir; he has a cause here for his nervousness—eye strain. Eye strain may cause nervousness, and nervousness does cause indigestion; and there is no doubt about it if he has got considerable strain on one eye.

"Q. Doctor, with this eye trouble, the loss of his eye and followed by nervousness and indigestion, what would you say was the cause of his indigestion? A. I would—in all probability it was coming from strain on that eye.

"Q. Strain on that eye, that would be your opinion? A. Yes, sir. * * *.

"Q. On cross examination of plaintiff: I will ask you this; a fixer is regarded as being one of the more skillful positions there? A. Yes, sir.

"Q. In other words you are picked out for your particular talent to do this particular work, which requires a little bit more training and experience and knowledge, isn't that a fact, sir? A. Yes, sir."

Dr. Mikell further stated, in effect, in response to an inquiry by the Court as to the effect the use of glasses would have on the plaintiff's ability to perform the work in question, that in so far as the direct vision was concerned, he would answer that it would help the left eye, but it would not help his judgment of distances at all.

C. V. Perry, a witness called on behalf of the plaintiff, qualifying as an expert, stated it would be dangerous for

a man with one eye to try to carry on the work in which the plaintiff had been engaged.

In his testimony, the plaintiff further testified, as follows:

"Q. Mr. Thompson, you stated what your duties were on direct examination; that you were to repair the machine whenever it was out of order. In addition to that, what were you to do; to what extent did you have to keep a watch on the machines? A. Had to keep a watch on it, and connect a perfect cord; and I had to inspect that cord. And a lot of times I would find bumpy twister yarn, and inspect bumpy twister yarn on cord creel.

"Q. So you had to make that inspection, too? A. Yes, sir; lot of times there were three to five-ply twisters together; and if one of those small ply was out, it made a corkly yarn. And you had to see that, and to see those ends, to tell whether it was made in.

"Q. State whether or not you could do that as well after you lost your eye, than before? A. I couldn't.

"Q. State whether or not, before you quit, state whether or not it was more difficult for you to do it than it was the preceding month? A. I could do it all right.

"Q. You mean, before you were hurt? A. Yes, sir."

It seems to be the contention of appellant that the plaintiff did not quit the work in question because of his inability to perform the duties in connection therewith on account of faulty eyesight or an impaired eyesight, but that he gave up the work because of the failure to continue the policy in question for the sum of $2,000.00, and that at the time the plaintiff gave up the work he was performing the duties in connection therewith in a satisfactory way. This contention on the part of the appellant the plaintiff answered in the following manner, which testimony was brought out on cross examination:

"Q. We are talking about in May, 1933, I am asking you when you left Winnsboro Mills for good did you make any claims to Mr. Scarborough that you were unable to carry

on your work by reason of faulty eyesight or impaired eyesight? A. Yes, sir.

"Q. I ask you, if you didn't tell Mr. Scarborough if they would continue your policy for Two Thousand Dollars you would go back in the mill and work? A. I told him I would try just as long as I could possibly stay."

We are unable to agree with appellant in its contention that the case at bar is governed by the case of *Hickman v. Aetna Life Insurance Company*, 166 S. C., 316, 164 S. E., 878; and that case of *DuRant v. Aetna Life Insurance Company*, 166 S. C., 367, 164 S. E., 881. In our opinion, the case is governed by the cases of *Berry v. United Life & Accident Insurance Company*, 120 S. C., 328, 113 S. E., 141; *McCutchen v. Pacific Mut. Life Insurance Company*, 153 S. C., 401, 151 S. E., 67; *Davis v. Metropolitan Life Insurance Company*, 164 S. C., 444, 162 S. E., 429; *Marshall v. Kansas City Life Insurance Company*, 171 S. C., 321, 172 S. E., 504; and the case of *Thompson v. Aetna Life Insurance Company*, 177 S. C., 120, 180 S. E., 880. We also call attention to the case of *Dukes v. Jefferson Standard Life Insurance Company*, 172 S. C., 502, 174 S. E., 463, and the case of *Smith v. Prudential Life Insurance Company*, 174 S. C., 528, 178 S. E., 124.

Under our view of the case, there was evidence submitted tending to establish the material allegations of the complaint, that the plaintiff was totally and permanently disabled in the sense contemplated by the contract in question as construed by the Courts of this State. Therefore, the trial Judge committed no error in refusing defendant's motions for a nonsuit, direction of a verdict, and a new trial.

The exceptions are, therefore, overruled, and the judgment of the lower Court affirmed.

MR. CHIEF JUSTICE STABLER, JUSTICE BONHAM and MESSRS. ACTING ASSOCIATE JUSTICES G. DEWEY OXNER and A. L. GASTON concur.