The record on this appeal discloses that upon the trial in Superior Court these facts are uncontroverted:
In 1928 defendant issued a group life insurance policy, Number 2764, under the terms of which it (1) insured the lives of all the employees of the Tennessee Copper Company, called the Employer, and (2) provided for benefits for total and permanent disability as therein set forth, — agreeing to issue to the employer for delivery to each employee whose life is insured under the group policy an individual certificate setting forth a statement as to the insurance protection to which such employee is entitled under the terms thereof, and as to whom payable, and as to how terminable. The premiums on the policy were paid by the employer.
Plaintiff entered the employment of the employer in 1941, and received an individual certificate Number 2764-3014. This certificate, in respect to Total and Permanent Disability Provision, provides the following: "In the event that any employee while insured under the aforesaid policy and before attaining age 60 becomes totally and permanently disabled by bodily injury or disease and will thereby presumably be continuously prevented for life from engaging in any occupation or performing any work for compensation of financial value, upon receipt of due proof of such disability before the expiration of one year from the date of its commencement, the Society will, in termination of all insurance of such employee under the policy, pay equal monthly disability instalments, etc."
The parties stipulate (1) that the group policy of insurance issued by defendant to Tennessee Copper Company on the lives of its employees and *Page 11 
containing total and permanent disability provisions was in full force and effect on 31 December, 1945; (2) that effective 1 January, 1946, defendant, with consent and approval of Tennessee Copper Company, attached a rider to said policy, dated New York, October 15, 1945, executed by defendant and accepted by Tennessee Copper Company, — the effect of which was to stop premium payments and undertake to eliminate the total and permanent disability provisions; and (3) that after 1 January, 1946, Tennessee Copper Company did not pay premiums to keep the total and permanent disability provisions in effect after 31 December 1945
And plaintiff, Roy Ingram, as witness for himself, testified:
That he is 37 years old; that he was employed by Tennessee Copper Company on 6 January, 1941, to do labor; that during his employment he worked a little while in the copper mine and then went to the flotation plant and also did some work there in the plant where they were loading iron and concentrated copper; that in the plant was where they crushed ore by machinery, and there was dust from that; that during the last year that he worked for the Tennessee Copper Company he was on mill cleanup, that is washing with the hose, sweeping and such as that; that when he went to work his health was good as far as he knew; that he was thirty years old at that time; that in 1945 he noticed his health was failing; that he was getting short of breath all the time and had a lot of soreness in his breast; that when he had to do heavy physical labor or exercise, it just about put him in the bed; that his breast was sore, his wind was gone and hard work and labor would make it worse; that he didn't have much strength, — just gave out; that along about October, 1945, he consulted a physician about this, — Dr. T. J. Hicks at Copperhill, Tennessee; that smothering was his trouble; that after he went to see the doctor he went back to work and worked until 21 December, 1945; that on the 21st of December he went in to work and tried to work and botched around the place for about two hours, and about 10:30 had to quit and go home because he wasn't able to work, — did not have the wind or the strength; that he went to bed and stayed in bed about a week, and went to see Dr. Hicks again; that after he had consulted him it was about a couple of weeks before he tried to work any more; that he tried to work again; that he was out for three weeks; that he was sick with silicosis, — the same trouble he had been having; that it was in October when it got bad enough to cause trouble; that in December he had to quit; that he did not work the three weeks from 21 December up into January, he was not able to hold his job; that he went back to work on 14 January, and worked six days; that he "just botched around and got by," but "wasn't able to work"; that after that, he consulted Dr. A. J. Ayers of Atlanta, Georgia: that Dr. Ayers examined him and made X-ray pictures of his chest; that *Page 12 
when he returned from Atlanta, he tried to work again on Monday and Tuesday, 28th and 29th of January, 1946; that he never did undertake to work for Tennessee Copper Company or anyone else after that because he wasn't able; that since then and since 21 December, 1945, he has not been physically able to do any kind of regular work; that he doesn't really know how to do anything but labor; that that is the only thing he is qualified to do; that he finished the sixth grade in school; that he has not held any job for compensation or profit since 21 December, 1945; that he had not been able to perform the substantial duties of any job since 21 December, 1945; that he tried to work; that after he quit the company, he bought a truck and tried trucking three or four different times, and after he got to working at that he "got to coughing up blood and had to quit"; that since 31 December, 1945, about two hours of chopping wood, or anything he usually does, puts him in bed; that he doesn't do any physical labor, — it cuts off his breath, and exhausts him; and that he requested his attorney to write the letter that has been described and admitted in the pleadings stating that he was disabled.
Then, on cross-examination, plaintiff further testified: That his work before he went to the Tennessee Copper Company was mainly farming; that he worked on, and owned a farm, — three acres in 1941; that he worked on this and some at the old home-place, his mother's place, about 115 acres; that he did farm work and cut wood on that; that he began feeling bad but did work practically regularly during 1945; that he worked 139 1/2 hours from 1 December, 1945, to 21 December, 1945; that on 30 December he was on vacation and got paid for that; that he was paid for the week up to 6 January, 1946; that he was on vacation, and was paid for six days; that he wasn't paid for the first 14 days in January; that that wasn't vacation; that he was sick; that he was paid from the 14th on; that he worked on the 28th and 29th of January, and was paid for these two days; that he bought a little place, 25 acres, about half a mile from his mother's place, and moved there; that there are six or seven acres of it under cultivation; that he is not living as a farmer like he did before he went to the Tennessee Copper Company; that in 1948 he had 1 1/2 acres in cultivation; and that he has been renting his place.
Plaintiff, continuing on cross-examination, testified: "I filed a former suit in this same case . . . I swore to the complaint, — to its correctness. I stated in that complaint that I worked for Tennessee Copper Company and about ore and crushing machinery and in silicon dust for more than four years and from January 6, 1941, until January 29, 1946. I was still in their employment for that long. I swore in paragraph 10 that on January 29, 1946, and while the said insurance was in full force and while I was in the employ of said Tennessee Copper Company, and *Page 13 
before I had reached the age of sixty years, I became totally and permanently disabled . . . I opened that paragraph by stating that I became totally and permanently disabled on January 29, 1946; that was the last day I worked . . . I had Mr. Gray write a letter to the company stating that I was totally disabled."
Plaintiff then offered in evidence copy of letter of 18 July, 1946, from his attorney to defendant, in which the subject stated is: "Re: Roy Ingram, Employee and Assured, formerly of Copperhill, Tennessee, now Suit, North Carolina. Employer: Tennessee Copper Company. Policy No. 2764-3014," and in which it is further stated: "Mr. Ingram was employed by Tennessee Copper Company on January 6, 1941, and continued in that employment until January 29, 1946, at which time he was forced to quit work because of total and permanent disability resulting from silicosis contracted while working in silicon dust for Tennessee Copper Company. In behalf of Mr. Ingram I am hereby making application for the total and permanent disability provided under the terms of the policy and in support of this hand you herewith copy of the statement of Dr. Thomas J. Hicks, of McCaysville, Georgia, and of Dr. A. J. Ayers of Atlanta, Georgia . . . Please let us have proper blanks on which to make formal claim for this as Mr. Ingram is wholly unable to work, suffers pain in his chest with acute shortness of breath."
Plaintiff then offered in evidence copies of the statements of Dr. Hicks and Dr. Ayers referred to in the letter from which the above quotation is taken. The Dr. Hicks statement addressed "To whom it may concern," is dated 16 February, 1946, and relates to examination and diagnosis on 1 February, 1946, concluding with this: "Impression: From the correlation of history, chief complaint and X-ray finding I am of the unbiased professional opinion this now has well developed disabling first stage Silicosis." The Dr. Ayers statement, in form of letter to Dr. Hicks, dated 23 January, 1946, relates to X-ray made on plaintiff 22 January, 1946, and concludes with this: "Impression: Chronic bronchitis, moderately advanced silicosis."
Plaintiff further alleges in his complaint, and defendant admits in its answer that plaintiff, through his counsel, under date 18 July, 1946, wrote defendant claiming to be disabled and requesting blanks on which to make formal claim for disability; and that defendant, under date of 31 July, 1946, acknowledged receipt of plaintiff's claim, but did not furnish any blanks, as requested, on which plaintiff might make any additional proof, and defendant did not request any additional proof. And, on the trial plaintiff offered in evidence letter from assistant superintendent of defendant to plaintiff's attorney, reading in part: "We regret to inform you that we can see no basis for a claim under the terms and conditions of the policy." *Page 14 
Plaintiff next offered the deposition of Dr. A. J. Ayers, specialist in primary clinical pathology and radiology, in respect to X-rays of plaintiff taken 22 January, 1946, and 15 July, 1947. Referring to the X-ray taken on the first date, the doctor testified: "My interpretation of the film on that date was chronic bronchitis, moderately advanced silicosis I call attention to the indications upon the film of the silicosis and the areas, etc. . . . I do mention that it is the peripheral lung structure. Also there is marked thickening of the lung markings . . . there are some few calcified areas in and around . . . the lung roots . . . I feel like I am familiar with the disease of silicosis . . . In any real dusty place you get a substance that would remain in your lung tissue and produce silicosis . . . The effect of this silicotic condition I have mentioned on the patient is that it makes him shorter winded, so to speak, or makes it more difficult for him to get the amount of oxygen into his circulation . . . The effect of silicosis on a person's ability to perform manual labor is it will make him very short-winded . . . The development of silicosis is a relatively slow process; it would require a great many months or years to develop."
The witness, in answer to hypothetical questions, based on the X-ray taken on 22 January, 1946, and on evidence as to plaintiff's working conditions, and his physical condition, gave it as his opinion that plaintiff had moderately advanced first stage silicosis to substantially the same extent on 31 December, 1945, as on 22 January, 1946. Then the witness interpreted the X-ray of 15 July, 1947, as showing second stage silicosis, — that silicosis is largely classified as first stage, second stage, and third stage; that it is hard to say whether the disease of silicosis ever improves; but that in his opinion, as a medical expert, it is generally a progressive disease, and usually there is an increase in the silicotic condition, even though the patient is removed from the dust.
Then after further examination, both cross and re-direct, the witness concludes his testimony by saying in substance that it is the opinion of most radiologists that where a man has silicosis and leaves that particular kind of work where he is exposed to it, that there is possibly some progression for a short while and thereafter progresses no more; and that in his opinion he would place Roy Ingram outside where he wouldn't be in the dust.
Dr. Thomas J. Hicks, as witness for plaintiff, held by the court to be a medical expert, and expert radiologist, testified in pertinent part: "I know Roy Ingram. He first came to my office for examination on October 12, 1945 . . . I examined Mr. Ingram physically and made a fluoroscopic examination of his chest which revealed the characteristic marks I find in men who have silicosis from two to five years in the mining area. I don't recall seeing Mr. Ingram any more until early in 1946. The second *Page 15 
time he visited my office I found that his condition had not improved and his symptoms were coming from a lung condition and I referred him to Dr. Ayers . . . His condition had progressed, — a mild progression, — most cases of silicosis progress slowly from the time the first particles of dust . . . enter the lung . . . they become embedded in the lung cells and diminish or decrease the lung space. The other way silicosis affects . . . it makes the patient short of wind or short of breath and he tires easily on physical exertion and he has pain in his chest and a cough and many times he expectorates blood. I did not make an X-ray film of Mr. Ingram. I studied the X-ray film Dr. Ayers sent . . . In comparing the film of January 22, 1946, with that taken by Dr. Ayers on July 15, 1947, my interpretation would be that there is a visible and noticeable progression of the fibrosis and extension of this fibroid condition in the lung on both sides of the heart . . . Here in the United States, we ordinarily classify silicosis into three stages: First, second, and third, but many times people die before they go into the third stage of silicosis. Second stage silicosis clearly cuts down on the patient's ability to do manual labor."
Plaintiff offered two other witnesses, one of whom testified that he had seen plaintiff try to work on his farm since 1 January, 1946, and when he did, he had difficulty getting his breath, seemed like; and the other, who testified that he has had occasion to see and observe plaintiff since 1945, — that he had seen him try to work, the first time was in the Spring of 1946. He was working then, he was trying to plough. He wasn't getting along with it, — that he breathed very short and seemed to be out of breath; that he had to stop; and that as he, the witness, passed back and forth he could see plaintiff nearly every day, and during the period since January, 1946, he has not seen plaintiff doing any work.
Motion of defendant for judgment as of nonsuit at close of plaintiff's evidence was allowed, and from judgment in accordance therewith plaintiff appeals to Supreme Court and assigns error.
It is conceded on all hands that the total and permanent disability provisions of the policy of insurance sued on in this action terminated 31 December, 1945. Hence this is the question for decision: Is the evidence offered by plaintiff on the trial below, taken in the light most favorable to plaintiff, sufficient to support a finding by the jury that in December, 1945, he was totally and permanently disabled by bodily disease, within the meaning of the provisions of the policy of insurance on which the action is based? We are of opinion, and hold, that it is *Page 16 
sufficient. It would seem that the evidence brings the case within the principle applied in Bulluck v. Ins. Co., 200 N.C. 642, 158 S.E. 185; Smith v. Assurance Society, 205 N.C. 387, 171 S.E. 346; Fore v. Assurance Society, 209 N.C. 548, 184 S.E. 1; Blankenship v. Assurance Society,210 N.C. 471, 187 S.E. 590; Edwards v. Junior Order, 220 N.C. 41,16 S.E.2d 466.
The present case is distinguishable in factual situation from the line of cases of which Thigpen v. Ins. Co., 204 N.C. 551, 168 S.E. 845; Boozer v. Assurance Co., 206 N.C. 848, 175 S.E. 175; Hill v. Ins. Co.,207 N.C. 166, 176 S.E. 269; Carter v. Ins. Co., 208 N.C. 665, 182 S.E. 106; Lee v. Assurance Co., 211 N.C. 182, 189 S.E. 626; Medlin v. Ins. Co.,220 N.C. 334, 17 S.E.2d 463; Jenkins v. Ins. Co., 222 N.C. 83,21 S.E.2d 832; and Ford v. Ins. Co., 222 N.C. 154, 22 S.E.2d 235, are representative.
However, since there must be a new trial in the case, we refrain from discussion of the evidence.
The judgment of nonsuit is
Reversed.