BESSIE FAIR v. THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES.

(Filed 20 November, 1957)

1. **Insurance § 34a—Evidence held insufficient to show total and permanent disability within coverage of insurance policy.**

    The evidence disclosed that plaintiff's intestate was employed in a tobacco processing plant and was discharged for putting a metal bolt or pin in a bundle of tobacco. Plaintiff's evidence tended to show that intestate began to show signs of mental disturbance about a year before her discharge and that her mental condition became progressively worse until her death more than two years after her discharge, and that on the date she was discharged she was insane and by reason of her insanity was totally and permanently unable to work. However, all the evidence disclosed that plaintiff's intestate was able to perform and did perform every day the duties of her employment up to and including the day of her discharge, which terminated her insurance, and that she was paid regularly for her work. *Held:* The evidence, considered in the light most favorable to plaintiff, does not show that intestate at the time of her discharge was totally and permanently disabled from performing or engaging in any work of financial value within the coverage of the disability clause sued on, and nonsuit was proper.

2. **Same—**

    Total and permanent disability as used in a disability clause of an insurance policy cannot logically be construed to mean partial disability or disability to a limited degree.

    BOBBITT, J., dissenting.

    HIGGINS, J., concurs in dissent.

APPEAL by plaintiff from *Crissman, J.,* 11 February 1957 Civil Term of FORSYTH.

Civil action to recover on a certificate of insurance issued by defendant to Mallie F. Grier as an employee of the R. J. Reynolds Tobacco Company of Winston-Salem, North Carolina, pursuant to the provisions of a policy of Group Life Insurance issued by the defendant to the R. J. Reynolds Tobacco Company, brought by plaintiff, the mother of Mallie F. Grier, who was designated the beneficiary in the certificate of insurance.

From a judgment of nonsuit entered at the close of the plaintiff's and the defendant's evidence, plaintiff appeals.

*Leake & Phillips and W. Z. Wood for plaintiff, appellant.*

*Womble, Carlyle, Sandridge & Rice for defendant, appellee.*

PARKER, J. The Group Life Insurance Policy and the certificate of insurance issued to Mallie F. Grier are not in the Record

before us. The Record merely sets forth, what it says are "the essential portions of the certificate of insurance, which are deemed necessary to the understanding of the appeal."

According to the Record before us the certificate of insurance contains the following provisions:

"TERMINATION. The insurance of any Employee under the above mentioned policy shall automatically cease . . . upon the termination of his employment with the Employer in the specified classes of Employees . . . ."

"TOTAL AND PERMANENT DISABILITY PROVISION. In the event that any Employee while insured under the aforesaid policy and before attaining age 60 becomes totally and permanently disabled by bodily injury or disease and will thereby presumably be continuously prevented for life from engaging in any occupation or performing any work for compensation of financial value, upon receipt of due proof of such disability before the expiration of one year from the date of its commencement, the Society will, in termination of all insurance of such Employee under the policy, pay equal monthly Disability-instalments, the number and amount of which shall be determined by the Table of Instalments below; . . . ."

Mallie F. Grier was an employee of the R. J. Reynolds Tobacco Company continuously from 30 April 1930 until 7 August 1952, when her employment was terminated by discharge for putting an iron hogshead bolt or pin in a bundle of tobacco, and placing such bundle of tobacco on a conveyor belt with a tipper on the end that cuts the head off the bundle of tobacco. The conveyor belt carried this bundle of tobacco under the tipper, which nicked the iron bolt or pin, and a magnet caught the bolt or pin when the tobacco and bolt or pin went from the fifth to the fourth floor on a metal chute. If the magnet had not caught the bolt or pin, it would have gone in the machinery of the mill. The machinery is filled with knives turning at a very high rate of speed, and if a piece of metal hits the knives, it tears them off. During this period she was insured under the policy of Group Life Insurance issued by the defendant to the R. J. Reynolds Tobacco Company.

Plaintiff's evidence comes from ten relatives or friends of Mallie F. Grier, and tends to show these facts:

During the time that Mallie F. Grier was employed by the R. J. Reynolds Tobacco Company she never missed a day from work, until she was discharged. She went to work every day, and worked regularly, and was working regularly on 7 August 1952, when she was discharged. She was paid regularly for her work, and was paid for the part of the day she worked on 7 August 1952, the day of her discharge. She started to acting

queer in the middle of 1951, and her mental condition became progressively worse until her death on 4 May 1955. On the night before she was discharged her mother testified "she hollered and cried, and stretched her eyes, and foaming at the mouth." Plain- tiff's witnesses testified that in their opinion Mallie F. Grier prior to, and on, the date she was discharged was insane, and by reason of her insanity was totally and permanently unable to work. Such mental condition did not improve up to the time of her death. No report was made by any one to the R. J. Reynolds Tobacco Company that she was insane or mentally disordered before she was discharged, or at any time.

Mallie F. Grier went to a hospital in November 1952. In 1954 she was operated on, and on 4 May 1955 died from cancer of the liver, when she was between forty and fifty years of age.

She did no work after her discharge. After her discharge she made application to the North Carolina Employment Security Commission for unemployment benefits. She was never placed in a mental institution, but lived in the house with her mother, the plaintiff. During her life, she made no claim under her cer- tificate of insurance. Her mother knew she had this certificate of insurance, which was in the house all the time, knew its pro- visions with reference to total and permanent disability, but no claim was made on it until after Mallie F. Grier's death in 1955. Plaintiff is a retired worker of the R. J. Reynolds Tobacco Com- pany, and on several occasions has filed claims for sick benefits under the policy she has. Plaintiff commenced this action by the issuance of summons on 2 May 1956.

Defendant's evidence tends to show these facts: Mallie F. Grier had one of the best work records any employee R. J. Reyn- olds Tobacco Company has ever had. According to the daily work record kept by the R. J. Reynolds Tobacco Company, Mallie F. Grier did not lose a single day from her work in 1952 prior to her discharge on 7 August 1952, she was not absent from her regular duties a single day in 1951, 1950, 1949 and 1948, except when on paid vacations. The same applies to 1947, except for absence on strike from 1 May to 9 June. Her employment record for prior years is substantially similar. Her work record shows that "she was discharged for putting a bolt in a hand of tobacco and running it through a machine." She was considered one of the best and most prompt employees the Reynolds Tobacco Com- pany ever had, until she was discharged. She did her work in a satisfactory manner up until her discharge. She never made any complaint about her mental condition, and her foreman under whom she worked considered her sane. "She was never laid out on account of sickness." The suggestion that she was crazy when discharged was first made when the case started. Her rate

of pay was $1.10 an hour. The insurance of Mallie F. Grier is called a "contributory insurance plan," and the employee makes contributions each month to the payment of the premiums. Prior to 7 August 1952 the tobacco company had had two or three mills a week torn up by these hogshead's bolts or pins. The workers were cautioned, if they found any bolts or pins, to turn them in to the supervisor of the blending unit. Every one did except Mallie F. Grier. These bolts or pins had been coming through two or three weeks on the middle line where she was working. She was watched, and seen putting the bolt or pin in a bunch of tobacco, and placing the tobacco on the conveyor belt. The North Carolina Employment Security Commission had given Mallie F. Grier certain benefits after her discharge. The Reynolds Tobacco Company lodged a protest. A hearing was had. Curtis Lane, Personnel Assistant, Manufacturing-Personnel Department, of the tobacco company, Frank E. Johnson, the foreman under whom Mallie F. Grier worked, and Mallie F. Grier, were sworn and testified. The witnesses for the tobacco company testified that the basis of the tobacco company's objection to the giving of benefits to Mallie F. Grier was that she had been seen placing a hogshead pin in a bundle of tobacco in an attempt to damage machinery of the company, and she had been discharged for it. Mallie F. Grier denied putting the hogshead pin in a bundle of tobacco, as she always did. The deputy hearing commissioner asked her if she was able to work, and she replied she was. He asked her was she actively seeking work, and she said she was.

In *Boozer v. Assurance Society,* 206 N.C. 848, 175 S.E. 175, the plaintiff was a former employee of the R. J. Reynolds Tobacco Company, and the defendant was the same defendant as in the instant case. The Boozer Case was an action to recover on a certificate of insurance which was issued on 3 December 1929, by the defendant to the plaintiff as an employee of the R. J. Reynolds Tobacco Company, pursuant to the provisions of a policy of Group Life Insurance, by which the defendant had insured certain employees of the said tobacco company. The provisions in the policy as to termination of employment, and total and permanent disability are identical with such provisions in the policy in the instant case. The evidence showed that while Boozer was insured under said policy, he became disabled as the result of a disease which he had contracted while in the employment of the tobacco company; this disease by its very nature affected the mind of Boozer, and was progressive and incurable. Prior to his discharge, and while he was insured, he suffered a disability by disease, which was permanent. On 26 September 1932 his employment terminated by his discharge for a violation

of a rule of the company in having whisky in his possession on the premises of the company while at work. The evidence further showed that notwithstanding Boozer's disability, he continued to perform his work as an employee of the tobacco company up to and including the day of his discharge. His services were satisfactory to his employer. Boozer tried without success to get other work. In January 1933 he was adjudged insane, as the result of the disease from which he was suffering prior to his discharge. Since 13 January 1933, and up to and during the trial, Boozer has been in the State Hospital for the Insane. His action was prosecuted by his duly appointed next friend. The jury found that Boozer on the date of his discharge was totally and permanently disabled by bodily injury or disease, and judgment was signed in accord with the verdict. This Court in reversing the trial court said:

> "Conceding that there was evidence at the trial tending to show that plaintiff suffered a permanent disability from disease, while he was insured by the defendant, and before he had attained the age of 60 years, we must hold that there was no evidence tending to show that the disability was total. All the evidence shows that plaintiff was able to perform and did perform the duties of his employment up to and including the day of his discharge, which terminated his insurance. For this reason there was error in the refusal of the court to allow defendant's motion, at the close of all the evidence, for judgment as of nonsuit. See *Thigpen v. Ins. Co.*, 204 N.C. 551, 168 S.E. 845."

*Corsaut v. Equitable Life Assurance Society of the U. S.*, 203 Iowa 741, 211 N.W. 222, 51 A.L.R. 1035, was an action upon an insurance policy. On 30 January 1922 the defendant issued its policy of insurance upon the life of Dr. James Calvin Corsaut. The insured died on 31 December 1923. The plaintiff was the wife of the insured, and the beneficiary named in the policy. The premium on the policy was due on the 19th day of January of each year. The policy contained the following provision: "If the insured becomes wholly and permanently disabled before age 60, the society will waive subsequent premiums payable upon this policy, subject to the terms and conditions contained on the third page hereof." The petition alleged that at the time the premium became due on 19 January 1923, and for some time prior thereto, and thereafter until the date of the death of the insured, he was totally and permanently disabled by disease, and was totally insane and incompetent to transact any business. It was undisputed in the evidence that the premium due on 19 January 1923 was never paid. The plaintiff offered evidence to this effect: In November 1922 plaintiff noticed that her husband had despondent spells, he would cry, and have spells of laughing. He could

not remember people, he could not recognize his best friends, he would walk the floor, and hold his head, and that in making calls in town he would sometimes return home, and say he could not find the place where he wanted to go. He complained of pressure in his head, and that he could not remember. He spent money recklessly, and had bills he claimed had been paid, which had not been paid. He wrote cheques when he had no money in the bank, and when spoken to about it said he thought he had plenty of money in the bank. He was examined by a doctor at a Psychopathic Hospital in Iowa City. One doctor testified that he had known the insured for eleven or twelve years, that he occupied a suite of rooms with the insured, that they had the same reception room and office girl, and that this arrangement continued until four or five months before the insured's death, that he saw insured nearly every day, that during the fall and winter of 1922-23 he noticed that the insured acted differently, became despondent, talked about not feeling well, that insured assisted in performing an operation with the witness and another doctor by administering the anaesthetic, and gave more than was necessary, and they were compelled to resort to artificial respiration to restore the patient, and that in his opinion insured was of unsound mind in January 1923. Another doctor who had an adjoining office testified that he saw insured nearly every day, that he was present when insured overanaesthetized the patient on 26 December 1922, and that in his opinion in January 1923 the insured was of unsound mind. A banker testified that about the early part of 1922 the insured had overdrafts in his bank, that he asked insured to make a financial statement, and the insured did so, but the banker "could not make head or tail out of it," and put it in the waste basket. Other facts are stated in the excerpt from the court's opinion quoted below. In reversing a judgment based on a jury verdict for the plaintiff, the Supreme Court of Iowa said:

" 'Wholly and permanently disabled' cannot logically be construed to mean partially disabled, or disabled to a limited degree, or disabled from doing certain things while able to do others. Under the record it cannot be said that this case presents an instance of an insured who is 'wholly and permanently disabled.' Undoubtedly the insured was affected with a mental breakdown, and this began to be noticeable in the year 1922; but at or about the time that the premium in question was due, and for several months thereafter, the insured was carrying on the practice of his profession, was treating patients, and, so far as the record discloses, without making mistakes in the very delicate and, in a sense, dangerous business of administering medicine. The only specific instance in the record looking toward a lack of

judgment in this regard is the one instance where, as late as December, 1922, physicians closely acquainted with him evidently deemed him competent to undertake the delicate task of administering an anaesthetic, and it appears that he administered too much of the anaesthetic, and it became necessary to resuscitate the patient. In the light of common knowledge it cannot be said that this incident is evidence of 'total and permanent disability.' The number of patients shown by the books of the physician to have been treated during the period from January to June, 1923, runs into the hundreds. According to the testimony of the office girl, some of these entries were erroneous, and the physician doubtless made charges against people whom he did not treat. He was forgetful and negligent and subject to spells of exhilaration and of depression, but the undisputed fact remains that during this entire period of time he was in regular attendance at his office, and was continuously engaged, more or less, in treating patients, administering medicine, and practicing his profession. In June of 1923 he made an examination of an applicant for insurance, filling out the somewhat extensive blank form required for such examination in detail, and received a check therefor, and endorsed the same. Without reviewing the record further, we are constrained to hold that a verdict to the effect that during this period of time the insured was 'wholly and permanently disabled' is contrary to the record in the case and cannot be permitted to stand. The trial court should have sustained the appellant's motion for a directed verdict made at the close of all of the testimony."

All the evidence shows that plaintiff's intestate was able to perform, and did perform regularly every day the duties of her employment up to and including the day of her discharge, which terminated her insurance, and that she was paid regularly for her work. Up to the day of her discharge she had a most remarkable work record with the R. J. Reynolds Tobacco Company. It is true that plaintiff's witnesses testified that in their opinion Mallie F. Grier prior to, and on, the date she was discharged was insane, and by reason of her insanity was totally and permanently unable to work. Nevertheless her work record is a stubborn fact that flinches not, and it is beyond question that her services were satisfactory to the tobacco company, and it actually paid her $1.10 an hour for her work. What the Court said in *Thigpen v. Ins. Co.*, 204 N.C. 551, 168 S.E. 845, is applicable here: "The law is designed to be a practical science, and it would seem manifest that a plain, everyday fact, uncontroverted and established, ought not to be overthrown by the vagaries of opinion or by scientific speculation." The only specific instance in the rec-

ord as to Mallie F. Grier's inefficiency in her work is her putting a hogshead bolt or pin in a bundle of tobacco, and placing it on the conveyor belt the day she was discharged. In the light of her work record it cannot be said that this incident is evidence of total and permanent disability to perform any work for compensation of financial value as provided for in the policy.

Viewing the plaintiff's evidence in the light most favorable to her, we hold that plaintiff has not offered evidence that her intestate was totally and permanently disabled from engaging in any occupation or performing any work for compensation of financial value sufficient to require the submission of her case to the jury. *Drummonds v. Assurance Society,* 241 N.C. 379, 85 S.E. 2d 338; *Johnson v. Assurance Society,* 239 N.C. 296, 79 S.E. 2d 776; *Ireland v. Ins. Co.,* 226 N.C. 349, 38 S.E. 2d 206; *Ford v. Ins. Co.,* 222 N.C. 154, 22 S.E. 2d 235; *Jenkins v. Ins. Co.,* 222 N.C. 83, 21 S.E. 2d 832; *Medlin v. Ins. Co.,* 220 N.C. 334, 17 S.E. 2d 463; *Mertens v. Ins. Co.,* 216 N.C. 741, 6 S.E. 2d 496; *Lee v. Assurance Society,* 211 N.C. 182, 189 S.E. 626; *Whiteside v. Assurance Society,* 209 N.C. 536, 183 S.E. 754; *Carter v. Ins. Co.,* 208 N.C. 665, 182 S.E. 106; *Hill v. Ins. Co.,* 207 N.C. 166, 176 S.E. 269; *Boozer v. Assurance Society, supra; Thigpen v. Ins. Co., supra; Corsaut v. Equitable Life Assurance Society of the U. S., supra; Hickman v. Aetna Life Ins. Co.,* 166 S.C. 316, 164 S.E. 878; *Du Rant v. Aetna Life Ins. Co.,* 166 S.C. 367, 164 S.E. 881; *Morgan v. Traveler's Ins. Co.,* 172 S.C. 404, 174 S.E. 235.

The judgment of nonsuit is
Affirmed.

BOBBITT, J., dissenting: This is a borderline case; and I find myself "over the border" from the majority of my brethren.

Decision is based largely on *Boozer v. Assurance Society,* 206 N.C. 848, 175 S.E. 175. Certainly, that is the most favorable North Carolina decision for defendant's position. But there is an important distinction between the facts in the Boozer case and the facts in the case now before us.

Nothing connected with Boozer's work reflected inability to perform the services of his employment. His work was satisfactory up to and including the date of his discharge. He was discharged for violation of a company rule prohibiting an employee to have whiskey in his possession while at work.

Here the insured's work was not satisfactory up to and including the date of her discharge. On August 7, 1952, she was *caught* putting a bolt or pin in a bundle of tobacco and then placing the bundle on the conveyor; and it may be inferred from evidence offered by defendant that she had been doing this sort of thing for two or three weeks. No motive or reason in explanation of

such conduct is made to appear. Bearing in mind her splendid work record, this conduct of the insured, when considered with plaintiff's evidence as to her mental condition during this period, all in the light most favorable to plaintiff, would seem to indicate total mental disability to perform her work. In any event, I think this a permissible inference.

HIGGINS, J., concurs in dissent.