KATHLEEN McC. ANDREWS v. THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES.

(Filed 12 June, 1959.)

**Insurance § 27—  Testimony held insufficient to show that employee was totally disabled at the time of discharge terminating her insurance.**

Evidence tending to show that an employee was discharged for violation of company rules, that for some years prior to her discharge she had suffered severe headaches and had intermittently lost time from work because of them, together with expert testimony that the headaches were due to nervous tension and were without organic basis, *is held* insufficient to show that the employee was disabled on the date of her discharge terminating her disability insurance under the group policy sued on, and testimony of experts as to their opinion that she

was totally disabled at the time of her discharge was nullified by their testimony on cross-examination admitting that if she performed the duties of her employment on the date of her discharge she was not then totally disabled.

APPEAL by plaintiff from *Armstrong, J.,* at October 20, 1958, Term of FORSYTH.

Civil action to recover total and permanent disability benefits under a group insurance policy.

The record on this appeal discloses that at pre-trial hearing the following stipulations were made:

"1. That on the 3rd day of December, 1929, the defendant issued to the R. J. Reynolds Tobacco Company, for the benefit of its employees, what is known and designated as a Group Life Insurance Policy, which said policy, being Policy No. 3255, was in full force and effect on the dates mentioned in the pleadings, and is marked Plaintiff's Exhibit No. 1.

"2. That on the 28th day of January, 1945, the defendant issued to plaintiff its certificate No. 3255-27253, under the terms of which the defendant agreed to pay the plaintiff, in the event she became totally and permanently disabled, as defined in said certificate of insurance, the benefits referred to therein, to wit, the amount of $8,000.00, payable in monthly installments.

"3. The plaintiff was employed by the R. J. Reynolds Tobacco Company on January 28, 1945, and was discharged by the R. J. Reynolds Tobacco Company from her employment with that company on February 7, 1957, and that prior to February 7, 1957, the plaintiff was insured under the above certificate of insurance, which was terminated and ceased to be in full force and effect upon the date of her discharge on February 7, 1957, in accordance with the terms and provisions of the certificate.

"4. That the plaintiff, before institution of this action, duly complied with the terms of said insurance policy in the filing of notice of her claim."

The certificate of insurance issued by the defendant to the plaintiff, in so far as pertinent to this appeal, provides that "In the event that any Employee while insured under the aforesaid policy and before attaining age 60 becomes totally and permanently disabled by bodily injury or disease and will thereby presumably be continuously prevented for life from engaging in any occupation or performing any work for compensation of financial value, upon receipt of due proof of such disability before the expiration of one year from the date of commencement, the Society will, in termination of all insurance of

such Employee under the policy, pay equal monthly disability-installments," etc.

Plaintiff Kathleen Andrews, as witness for herself, testified in part:

"I was employed by the R. J. Reynolds Tobacco Company. I started work * * * July 28, 1944. I was issued an insurance policy, covering permanent disability, about six months after I went to work for the company * * * I worked at Factory Number 9 * * * I don't remember just exactly what my classification was, but we were working on Prince Albert tobacco in 1945. After that time I moved around all over the entire factory, in all the departments, all the plants except one.

"In February of 1957 I was an inspector on a cigarette machine in Plant Number 64 where Salem cigarettes were made. I had been an inspector in the cigarette factory approximately two or two and a half years at that time * * *

"The general state of my health has been poor since I went to work for Reynolds Tobacco Company in 1944. The first ten years I lost four hundred and forty-five days on account of my health * * * (in August of 1955). At that time the condition of my health was bad. I was under the care of a doctor * * * After August of 1955 I think I was absent around two hundred days in the next two years because of my health. That was from August of 1955 until February of 1957. I had severe headaches, and I had quite a bit of trouble with my kidneys. I was not operated on for my kidney trouble, but I had several kidney treatments. I was admitted to the hospital because of my kidney trouble.

"I suffered from severe headaches. I have the headaches all the time, but about two days out of a month they are not quite as bad as they are the rest of the time. That condition was gradually getting worse. I don't remember how old I was when my headaches started, but I do remember that I started having them before I started to school, when I was approximately five or six years old. They had gradually gotten worse as I have gotten older. In November of 1956 I think I was working in Plant Number 64. At that time the condition of my health was gradually getting worse all the time. As to whether or not I missed any work in November of 1956: I was out so much until really I don't know just when I was out. As to December: I just don't remember exactly the dates I was out, but I think I was out some in December. I was out in January of 1957. I was out the first of January for either one or two days, and then the last of January I was out for six days. I returned to work either the 3rd or 4th of February, I don't remember which,

but it was on a Monday. At that time I still wasn't feeling good. I don't recall whether or not I was working on the 18th of January, 1957. It was the last of January that I was out. From the time I last returned to work there until the time that I was discharged, my condition was getting worse. I was receiving medical treatment when I was out in January. Dr. G. J. Robbins and Dr. Hart were treating me. * * * In January of 1957, the period about which I am now testify(ing), I had another severe headache and my kidneys got bad. Dr. Robbins and Dr. Hart were prescribing medicine for me. February 7th was the last day that I worked. When I went to work there that day, I had a very bad headache. I had taken four B. C. powders from 6:30 until 8:00 o'clock that day. I also took some after I left the factory which was about 10:30. I did not take any cigarettes that morning * * * After I returned to work in January of 1957, I was not able to perform my work properly. I was having severe headaches. For the headaches I was taking B. C. powders, Anacin tablets, Goody powders, Bufferin tablets, and the medicine that the doctor had prescribed for me. I would take, on the average, about eight to ten B. C. powders a day, and I was taking my medicine that the doctor had prescribed in addition to those.

"Since I left the employment of Reynolds Tobacco Company, my health has gotten worse than it was then, and I am not able to do anything at all now. I have not been able to do any regular work. I have not had any regular work * * * I couldn't keep the housework up like it should be * * * . I was not able to do the housework then. I am not able to do it now * * * I do not do the housework now because I don't feel like it. Right now, my condition is very poor. This morning I got up the first time at a quarter after six, took something for my head, went back to bed, and got up again at 11:30. I have taken three B. C. powders since I got up at 11:30. I carry with me at all times something to take for my headaches. I have with me now two large packs of B. C. powders, a bottle of Bufferin tablets, and my prescription that Dr. Robbins gives me * * * If I follow Dr. Robbins prescription as he has given it to me, I sleep all the time * * * ."

Then plaintiff, under cross-examination, testified in pertinent part as follows: "I started work for Reynolds Tobacco Company in 1944. At that time I was thirty-eight years old * * * I was out either one or two days during the first part of January 1957. After those * * * I worked regularly every day up to about January 18, 1957. I think $1.67 per hour is what I was making * * * that was the highest rate

paid at that time for cigarette inspectors * * * from January 18th through January 22, 1957, I was out six days— that didn't include Saturday and Sunday. I don't think I went back to work on January 28, 1957. It was around the first of February * * * After I went back to work, I worked every day up until February 7, 1957 * * * being paid at the rate of $1.67 per hour for my work * * * On February 7th and from the first of January, 1957, I had been working in * * * Factory #64. I know it is against the rules to take cigarettes off the premises. There is a sign posted in every department * * * Mr. Leight did not tell me that I was being discharged because of my taking those cigarettes contrary to the rules. He just told me he'd have to discharge me * * * I returned the next day and received a check * * * for all wages the company owed me up to and including the time I worked on February 7, 1957."

Dr. Richard C. Proctor, witness for the plaintiff, admitted by defendant to be a medical expert, specializing in the field of psychiatry, testified in part: "I examined Mrs. Kathleen Andrews on March 4, 1957 * * * She told me that she had missed about one-fourth of the time from work for the preceding year prior to the time I saw her, and that she had been employed at the Reynolds Tobacco Company for about twelve and a half years in her work there. As a result of my examination, it was my opinion that she was suffering from tension headaches, what is called phychiatrically, a conversion reaction. I think that everybody has a certain amount of nervous tension or energy within them. Quite commonly with people this energy is converted into a physical symptom. In some people it is converted into headache— in others into nausea and vomiting, and it was my opinion in this particular patient that this tension, this nervous energy was converted into headaches. To a person suffering from this conversion reaction, the headache is real and can be disabling. I had, on March 4, 1957, an opinion satisfactory to myself, as to whether or not Mrs. Andrews is totally and permanently disabled so that she is unable to work with reasonable continuity in her usual occupation or in such an occupation as she is qualified physically and mentally under all the circumstances to perform substantially the reasonable and essential duties incident thereto; my opinion is that she was not able to perform the duties mentioned. I have an opinion as to whether or not she will be able to perform them in the future. I don't believe she will.

"If the jury should find from the evidence and by its greater weight that in January of 1957 Mrs. Andrews was suffering from these headaches; that she had been absent from work on numerous occa-

sions on account of it in the past and that her physical and mental condition at that time was approximately the same as it was when I examined her in March of 1957, I have an opinion, satisfactory to myself, as to whether or not in January of 1957 Mrs. Andrews was permanently and totally disabled. My opinion is that she was permanently and totally disabled."

And continuing on cross-examination Dr. Proctor testified in pertinent part: "I did not know that on the specific day of February 7, 1957, Mrs. Andrews went to work about 7:30 in the morning and worked for several hours and was paid $1.67 an hour by the R. J. Reynolds Tobacco Company for her work. I did not know that Mrs. Andrews worked the specific days from February 1st up until February 7th and worked the full work load down there and was paid $1.67 an hour as a cigarette inspector. As to whether or not she was able to work; Mrs. Andrews was working. If a person works, that is some evidence that they are able to work. I am testifying about facts that don't take into account the fact that she did work many days and was paid at the going rate. Mrs. Andrews was just in my office one time, for practically an hour. I took a history during that time. In her history she told me about the headaches. Headache is a very common ailment. It is about one of the most common ailments that all human flesh is addicted to. There are a lot of people who have headaches and nobody knows the cause of them. It is nothing organic. It is just a part of the makeup of that particular person. I know plenty of people * * * who have headaches, but yet they are working and carrying on in the great duty of life. If you'd say everybody is totally and permanently disabled and thereby prevented for life from engaging in any permanent employment because they have headaches every now and then, you would rule out a lot of people * * * ."

Dr. G. J. Robbins, witness for plaintiff, was admitted by defendant to be a duly licensed doctor in general practice. He testified in part: "I have seen and have treated Mrs. Kathleen Andrews. The first time I saw her was in April, 1956, or thereabouts * * * I saw her intermittently after that. I received a history during the course of my treatment of her. On the initial visit she had primarily the headaches; I took a history as to headaches, upper respiratory infection, colds and pleurisy. She had had the headaches for many years. They were at times incapacitating * * * She enumerated various stresses that caused these particular headaches. As far as physically, there were no actual physical ailments, nothing organically wrong as regards the headaches. My diagnosis was that they were tension head-

aches which is the same thing as tension hysteria, conversion head-ache is one type * * * I was still seeing her in the early part of 1957 * * *."

Dr. Robbins was asked, "Now, doctor, from your examinations which you have made of Mrs. Andrews * * * with particular reference to her condition as you knew it as her physician in January of 1957, do you have an opinion satisfactory to yourself, as to whether or not Mrs. Andrews is totally and permanently disabled so that she is unable to work with reasonable continuity in her usual occupa-tion or in such an occupation as she is qualified physically and mentally and under all circumstances to perform substantially the reasonable and essential duties incident thereto?"

He answered that he had such an opinion, and that it was that "She is unable to perform the duties that you have outlined."

Dr. Robbins further testified in part: "If the jury should find, from the evidence and by its greater weight, that over a period of many years, since Mrs. Andrews was a little girl of about school age or be-fore, she had had recurrent headaches; that over the years these headaches had become worse as she grew older; that she reached the point that she had them daily, with maybe one or two days out of each month; that during the years she lost intermittent periods from work because of these headaches; that in 1955 and 1956 she was out of work on a number of occasions due to the headaches; that during that period of time her headaches became worse; that in January, 1957, she was continuing to suffer with these headaches, which worsened, rather than getting better; that she has not worked since February 7, 1957, and that since that time her headaches have become worse instead of better; that she is not able to do her house-work, I have an opinion, satisfactory to myself, as to whether or not in January, 1957, Mrs. Andrews was permanently and totally dis-abled: My opinion is that she was permanently disabled and that her disability was total."

Then the doctor, under cross-examination, continued in pertinent part: "All that I found wrong with Mrs. Andrews was a respiratory condition and tension headache when she came to see me in April, 1956 * * * she stayed away from work on account of the respiratory condition approximately four days, from my records. After she re-covered, she was allowed to go back to work * * * and I assume she did * * * I let her go back to work. At Reynolds * * * she was able to go back to her job as the operator of a cigarette machine * * * she was not totally and permanently disabled at that time.

"I saw her next in May of that year. According to my records,

ANDREWS *v.* ASSURANCE SOCIETY.

then again she was out from work about four or five days * * * She had a kidney ailment * * * After the kidney infection cleared up, I approved her to go back to work again * * * In my opinion, at that time she was not totally and permanently disabled * * * I took her blood pressure * * * a number of times, and it was normal every time. Blood pressure is one of the revealing factors that a doctor looks for when somebody comes to him to find out whether or not they are really sick. I never did find this lady's blood pressure elevated a bit. It was borderline. I never found anything the matter with her head. * * * I saw her again later on in May of that year * * * We thought she had a stomach condition (gall bladder) and hospitalized her * * * We discharged her from hospital on June 5th * * * She didn't have any stomach disorder. In my opinion, tension is causing the headaches she was complaining about. We all have tension. Everybody sitting in this courtroom at one time has tension * * * The only thing I could find causing these headaches she was complaining about was tension. I could find no organic condition that was causing the headaches. I relied upon her word almost altogether that she was having these headaches."

Chet McCann, witness for plaintiff, testified in part: "I am the father of Mrs. Kathleen Andrews. During and prior to January of 1957, I saw Mrs. Andrews most of the time about once or twice a week. She was just sick all the time; looked like sometimes when I'd see her, her eyes were just sticking out on stobs nearly; and, of course, when she didn't have that headache or something, why seemed like she was a little more 'perter'. She complained to me of having headache; she had it most of the time about every two weeks; looked like she'd have it worse about every two weeks than any other time. She was just pale and white, looked like she couldn't hardly go at all. Sometimes she'd walk pretty good, and sometimes she'd stagger. She didn't complain to me about nothing but that headache. She has had headaches off and on for ten or twelve years, I reckon."

In response to the question: "The condition which you have described as having seen her over a period of ten or twelve years and up to and including January of 1957, had it improved or had it gotten worse?", the witness answered, "Yes, it seemed like it gets worse all the time." And in response to this question: "Now, Mr. McCann, from your observation and contact with your daughter, Mrs. Kathleen Andrews, and based upon your observation of her, do you have an opinion, satisfactory to yourself, as to whether or not in January, 1957, she was able to work with regularity and carry on the duties

incident to her occupation?", the witness answered: "No, I don't think she was."

At the close of plaintiff's evidence the defendant demurred to the evidence, and moved for judgment as of nonsuit. Motion was allowed. Plaintiff excepts thereto and appeals to Supreme Court and assigns error.

*Fred M. Parrish, Jr., W. Scott Buck for plaintiff, appellant.*
*Womble, Carlyle, Sandridge & Rice for defendant, appellee.*

WINBORNE, C. J. The determinative question on this appeal is whether the trial court erred in sustaining defendant's motion for judgment as of nonsuit entered at the close of plaintiff's evidence. Testing the sufficiency of the evidence, under applicable principles of law, in the light most favorable to plaintiff, and giving to her the benefit of all reasonable inferences to be drawn therefrom, it is manifest that the trial court correctly ruled in granting the nonsuit.

The identical provision, pertaining to total permanent disability has been the subject of four other recent cases in this Court against the present defendant. They are: *Boozer v. Assurance Society*, 206 N.C. 848, 175 S.E. 175; *Johnson v. Assurance Society*, 239 N.C. 296, 79 S.E. 2d 776; *Drummond v. Assurance Society*, 241 N.C. 379, 85 S.E. 2d 338, and *Fair v. Assurance Society*, 247 N.C. 135, 100 S.E. 2d 373.

The facts in these cases are similar to the facts in instant case, indeed, more favorable to plaintiff, for there the plaintiffs had some organic condition,— while here the plaintiff has no organic disease. And in neither does it appear that at the time the insurance was terminated the plaintiff was totally and permanently disabled within the meaning of the insurance provision of the insurance policy.

The testimony of the doctors, under cross-examination, completely negatives any opinion given on direct examination to the effect that plaintiff, at the time the insurance was terminated, was totally and permanently disabled.

Hence, as in the cases above cited, evidence does not support the crucial averment which is essential to recover, to wit: that she was *totally and permanently disabled* by bodily injury or disease and will thereby presumably be continuously prevented for life from engaging in any occupation or performing any work for compensation of financial value — on or before February 7, 1957, the date of her discharge for cause and the termination of the insurance.

The judgment below is

Affirmed.