THE PAUL REVERE LIFE
INSURANCE COMPANY,
Plaintiff,

v.

Kenneth P. FORESTER, Jr., Defendant.

No. 3:97CV45–MCK.

United States District Court,
W.D. North Carolina,
Charlotte Division.

Dec. 4, 1998.

Erna A.P. Womble, Womble, Carlyle, San-
dridge & Rice, Winston–Salem, NC, for Paul
Revere Life Ins. Co. plaintiff.

Paul I. Klein, Crews & Klein, P.C., Charlotte, NC, for Kenneth P. Forester, Jr., defendant.

## ORDER

McKNIGHT, United States Magistrate Judge.

THIS MATTER is before the court for ruling on the following motions: (1) The Paul Revere Life Insurance Company's ("Revere") motion for summary judgment, filed October 15, 1998; (2) Kenneth P. Forester's ("Forester") motion to amend, filed October 15, 1998; and (3) Forester's motion for partial summary judgment, filed October 15, 1998.

## I. Factual and Procedural Background

On January 21, 1980, Revere issued a disability insurance policy ("Policy A") to Forester. Forester dutifully paid the insurance premiums on Policy A for approximately 14 years. However, on April 21, 1994, Forester failed to pay a quarterly premium, and Revere canceled his insurance coverage.

On October 27, 1994, Forester applied for reinstatement of Policy A. The reinstatement application asked Forester if, "within 5 years" of his application, he had "been treated by a physician or practitioner;" or "been ill or injured;" and whether he had "any physical or mental impairment;" and if he was "on medication." Forester responded "No" to all of these questions and he represented that his answers on the reinstatement application were true.

Revere reinstated Policy A effective October 27, 1994. Thereafter, on April 25, 1995, Forester submitted a claim for disability benefits under Policy A and under another disability insurance policy that had been issued by Revere to Forester in 1984 ("Policy B"). On his claim form, Forester alleged that he was totally disabled due to "Severe Depression." Forester indicated that he had experienced a "gradual decline" and that he had been unable to work since "November 1994."

Revere investigated Forester's disability claim and determined that Forester had made a number of misrepresentations on his reinstatement application for Policy A. For example, Revere learned that Forester had actually been receiving treatment for depression from Dr. Groder since August 5, 1994. Revere also learned that Forester was on anti-depressant medication at the time he completed the reinstatement application. Because of Forester's misrepresentations on the application, Revere elected to rescind the reinstated policy. Revere also decided to deny Forester's disability claim under Policy A because the medical evidence indicated that Forester's depression began prior to ten days after the reinstatement date.[1] With respect to Policy B, however, Forester's claim of disability was accepted and Revere began to make disability payments to Forester pursuant to Policy B.[2]

On January 30, 1997, Revere filed its complaint in this court seeking a declaratory judgment upholding its decision to rescind the reinstated policy. In his answer and counterclaim, Forester admitted making misrepresentations on his reinstatement application. However, Forester asserted that the reinstatement application was unnecessary because Policy A never lapsed. According to Forester, he suffered from a disability in April 1994 and was excused from paying insurance premiums on Policy A pursuant to the policy's waiver of premium provision.

On October 15, 1998, Revere filed a motion for summary judgment, while Forester filed a motion for partial summary judgment and a motion to amend his counterclaims. All of these motions are fully briefed and ripe for disposition.

## II. Analysis

### A. Summary Judgment Standard

Summary judgment is appropriate when the pleadings, responses to discovery, and the record reveal that no genuine issue of any material fact exists and that the moving party is entitled to judgment as a matter of

---

1. The reinstatement policy only covered loss due to sickness that began more than ten days after the reinstatement date.

2. As premiums for Policy B had been continuously paid by Forester since 1984, there was no lapse or reinstatement issue under Policy B.

law. *See* Fed.R.Civ.P. 56(c). The party moving for summary judgment has the initial burden of showing that no genuine issue of any material fact exists and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After the moving party has met its burden, the non-moving party must come forward with specific facts showing that evidence exists to support its claims and that a genuine issue for trial exists. *Id.; Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see* Fed.R.Civ.P. 56(e) (in response to motion for summary judgment, "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial"). When considering motions for summary judgment, courts must view facts and inferences in the light most favorable to the party opposing the motion for summary judgment. *Matsushita,* 475 U.S. at 587–88, 106 S.Ct. 1348; *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). When, however, the evidence from the entire record could not lead a rational fact-finder to find for the non-moving party, no genuine issue for trial exists and summary judgment is appropriate. *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348.

In the present case, Revere has filed a motion for summary judgment and Forester has filed a motion for partial summary judgment. In reviewing Revere's motion for summary judgment, the court must view the facts and inferences in the light most favorable to Forester. In reviewing Forester's motion for partial summary judgment, the court must view the facts and inferences in the light most favorable to Revere.

**B. Revere's Claim for Declaratory Judgment and Forester's Motion for Partial Summary Judgment**

Revere's complaint seeks a declaratory judgment upholding its decision to rescind the reinstatement application. Forester does not contest such a judgment. In fact, in his motion for partial summary judgment, Forester concedes that rescission of the reinstatement application is appropriate. Forester claims that upon such rescission, Forester is entitled to recovery of his reinstatement premiums—a total of $1,572.12. Recovery of this sum is the basis of Forester's motion for partial summary judgment.

It appears that Revere does not oppose Forester's motion for partial summary judgment. Revere agrees that Forester is entitled to a refund of his reinstatement premiums upon rescission of the reinstatement application. Thus, the court concludes that Revere's request for a declaratory judgment and Forester's motion for partial summary judgment should both be granted. The reinstatement application should be rescinded and Forester is entitled to a refund of its reinstatement premiums.

**C. Forester's Counterclaim and Revere's Motion for Summary Judgment**

The central issue in this lawsuit appears to be whether or not Policy A lapsed due to Forester's failure to pay premiums in April 1994. If Forester's failure to pay premiums on Policy A caused a lapse in insurance coverage, Forester would not be entitled to any benefits under Policy A. If, however, Forester's failure to pay premiums did not cause a lapse in coverage, Forester would be entitled to disability insurance benefits under Policy A.

Forester contends that Policy A never lapsed because he was disabled for a ninety-day period of time which included the date in which the premiums were due. Relying on a waiver of premium provision in Policy A, Forester argues that his disability excused his responsibility to pay his April 1994 insurance premium.

Revere, on the other hand, contends that the evidence in this case establishes as a matter of law that Forester was not disabled at the time his insurance premium was due in April 1994. Revere argues that because Forester was not disabled in April 1994, the waiver of premium provision did not prevent a lapse of Policy A. Since there was a lapse in Forester's coverage under Policy A, Revere

asserts that it is entitled to summary judgment on Forester's counterclaims relating to Policy A (not on the counterclaim relating to the reinstatement application though).

In reviewing a contract of insurance, the starting point is the relevant contract language. "In North Carolina, it is well settled that when construing an insurance policy a court must enforce the policy as written, without rewriting the contract or disregarding the express language used." *North Carolina Ins. Guaranty Ass'n v. Century Indemnity Co.*, 115 N.C.App. 175, 179, 444 S.E.2d 464, 467 (internal quotations omitted), *cert. denied*, 337 N.C. 696, 448 S.E.2d 532 (1994). Where the contract language is clear and unambiguous, the court cannot look beyond the terms to see what the parties' intent might have been. *Rosania v. Rosania*, 108 N.C.App. 58, 61, 422 S.E.2d 348, 350 (1992). "Clear and express language of the contract controls its meaning, and neither party may contend for an interpretation at variance with the language on the ground that the writing did not fully express his intent." *Olive v. Williams*, 42 N.C.App. 380, 383, 257 S.E.2d 90, 93 (1979). Where the language of an insurance contract is ambiguous, however, the court must interpret such language against the insurance company and in favor of the insured. *North Carolina Ins. Guaranty Ass'n*, 115 N.C.App. at 180, 444 S.E.2d at 467.

Here, Policy A contains a waiver of premium provision which provides as follows:

> If such injury or such sickness results in continuous *total disability* for a period of ninety consecutive days, the Company will waive the payment of any premium which thereafter becomes due while the Insured remains continuously totally or partially disabled, and the Company will refund any premium paid which became due after such disability commenced. After the termination of the period of total or partial disability during which a premium has been waived, the insurance afforded in this policy shall continue in full force and effect until the next premium due date at which time the Insured shall have the right to resume payment of premium as provided in this policy.

(Policy A at 3.) (emphasis added). " 'Total disability' means that as a result of such injury or sickness the Insured is unable to perform the duties of his regular occupation and is not engaged in any other gainful occupation." (Policy A at 2.) Thus, under the plain language of Policy A, Revere agreed to waive the payment of any premium that became due (1) while Forester suffered from an injury or sickness (2) which lasted for a period of ninety consecutive days (3) if Forester was unable to perform the duties of his regular occupation during such period and (4) if Forester was not engaged in any other gainful occupation during such period.

The parties appear to agree that Forester suffers from depression, which qualifies as a "sickness" under the language of Policy A. Indeed, Revere has paid Forester disability benefits for his depression since May 1995 pursuant to Policy B, which has a definition of total disability similar to the one in Policy A.

At dispute in the present lawsuit is whether, on April 21, 1994, the date Forester's premiums were due, Forester's depression amounted to a "total disability" which lasted for a period of ninety consecutive days. In order for Forester to meet his burden of proof on this issue, he must possess sufficient evidence from which a reasonable jury could conclude that for a period of ninety consecutive days, including April 21, 1994 (hereinafter "the relevant time period"), Forester was unable to perform the duties of his regular occupation and Forester was not engaged in any other gainful occupation. Forester need not establish that he was unable to perform *any work* during the relevant period. Rather, he is only required to prove that he was (1) unable to perform the duties of his *regular occupation* and (2) *not engaged* in the performance of any *other gainful occupation*.

In its motion for summary judgment, Revere argues that Forester cannot meet his burden of proof because the evidence before the court establishes that during the relevant time period, Forester was gainfully employed by "The Elms" and earning $600 per day. Revere argues that such evidence establishes as a matter of law that Forester was gainful-

ly employed, and thus not under a "total disability."

In his response to Revere's motion for summary judgment, Forester claims that "[a]t no time relevant to this case has Forester engaged in any "other" occupation." (Response at 8.) Forester states that his employment with The Elms was work done in his regular occupation as a real estate/developer/consultant. (*Id.*) Forester further asserts that despite his record of work at The Elms, Forester has presented sufficient evidence to create a genuine issue of fact as to whether he was capable of actually performing the duties of his regular occupation during the relevant time period.

Since Forester has conceded that his work at The Elms was work done by Forester in "his regular occupation," and since Revere does not appear to dispute this concession (*see* Revere's reply to Forester's response to Revere's motion for summary judgment), the central inquiry for the court is whether there is a genuine issue of material fact as to whether Forester was capable of performing the duties of his regular occupation during the relevant time period. In support of its motion for summary judgment, Revere has provided the court with a plethora of cases involving the interpretation of various disability insurance policies. The court notes that none of the cases submitted involves the interpretation of a waiver of premium provision. Nevertheless, several of the cases are instructive as they involve the interpretation of "total disability" under circumstances factually similar to the present case.

First, the court believes that the North Carolina Court of Appeal's statement in *Taylor v. Bankers Life & Casualty Co.*, 14 N.C.App. 418, 188 S.E.2d 728, *cert. denied*, 281 N.C. 628, 190 S.E.2d 473 (1972), is particularly instructive. After reviewing a number of North Carolina decisions, the Court of Appeals stated that "[t]here is a strong line of cases in North Carolina holding that where a plaintiff is actually working and performing his duties, he is not entitled to benefits under disability insurance and this applies even where there is expert testimony to the effect that plaintiff is disabled." *Id.* at 422, 188 S.E.2d at 731. In *Taylor*, the dis-

ability policy at issue provided for the payment of benefits upon proof that the insured was wholly disabled and prevented from performing each and every duty of his occupation. *Id.* at 420, 188 S.E.2d at 729. In support of his claim of disability, the plaintiff presented evidence that he suffered from chest pains while he was at work. *Id.* at 421, 188 S.E.2d at 730. The plaintiff also presented expert testimony from two physicians who testified that they believed plaintiff was disabled. *Id.* Notwithstanding this testimony, however, the court granted judgment in favor of the .defendant on the grounds that there was uncontroverted evidence that plaintiff was performing his duties up until the date he was discharged. *Id.* at 421–22, 188 S.E.2d at 730.

Similarly, in *Fair v. Equitable Life Assurance Society*, 247 N.C. 135, 136, 100 S.E.2d 373, 374 (1957), the plaintiff sought to recover disability insurance benefits under a policy which required proof that the employee was "continuously prevented for life from engaging in any occupation or performing any work for compensation or financial value." In support of her claim, the plaintiff presented witnesses who testified that Plaintiff was insane and totally disabled prior to the date her employment was terminated. *Id.* at 137, 100 S.E.2d at 375. Like the court in *Taylor*, however, the North Carolina Supreme Court granted judgment in favor of the defendant on the grounds that the evidence showed that plaintiff regularly performed the duties of her employment up to and including the date of her discharge. *Id.* at 141, 100 S.E.2d at 378, "Her work record is a stubborn fact that flinches not, and it is beyond question that her services were satisfactory to the tobacco company, and it actually paid her $1.10 an hour for her work." *Id.; see also Boozer v. Equitable Life Assurance Society*, 206 N.C. 848, 175 S.E. 175, 176 (although evidence indicated that the insured became disabled while still insured, he was able to perform and did perform the duties of his employment up to and including the day of his discharge; consequently, recovery was denied).

In addition to the above North Carolina cases, the court believes that one case from

outside North Carolina is persuasive on the issue before the court. In *Kunstenaar v. Connecticut General Life Ins. Co.*, 902 F.2d 181, 182 (2d Cir.1990), the plaintiff sought to recover disability benefits under an insurance policy which allowed benefits where sickness disabled an employee in such a manner that the employee was "completely prevented from performing the duties of his occupation or employment." The plaintiff presented evidence that prior to his discharge from employment, he suffered sweating spells, insomnia, loss of concentration and other pre-depression symptoms. *Id.* at 182. However, the district court denied recovery under the policy because it was undisputed that the plaintiff's depression symptoms did not cause the plaintiff to lose any time from work. *Id.* at 183. In affirming the district court decision, the Second Circuit quoted the following statement by the district court:

> It is an uncontested fact that Kunstenaar did not miss any work, except holidays during the summer of 1985. Kunstenaar supplies various dates to mark the onset of his disability but that discrepancy is not material to the case. Plaintiff confuses illness with total disability. No one is disputing the fact that Kunstenaar was ill. In fact, he may have been ill since June of 1985. However, illness is not to be equated with total disability.

*Id.*

■ In the present case, Dr. Martin Groder, Forester's treating psychiatrist, has opined that Forester has been "totally disabled" due to depression since January 1, 1994. (Forester's Exh. 3.) According to Dr. Groder, Plaintiff has been unable to perform the duties of his regular occupation and has not engaged in any other gainful occupation since prior to 1994. (*Id.*) Notwithstanding Dr. Groder's opinion, however, the evidence before the court establishes that Forester was President of FRI Realty in 1993 and in 1994. (App.624.)[3] From July 1993 through November 1994, Forester performed consulting services for The Elms Development ("The Elms") in Charleston, South Carolina,

pursuant to a contract between FRI Realty and The Elms. (App. 611–12; 622–23.) On the days Forester worked for The Elms, he worked 8 hours a day and earned $600.00 per day. (App.618.) FRI Realty's invoices to The Elms show that Forester billed The Elms as follows during the relevant time period: in January 1994, Forester worked for 7 days and billed The Elms $4,639.56 (including $439.56 in mileage); in February 1994, Forester worked for 9 days and billed The Elms $5,998.64 (including $597.84 in mileage); in March 1994, Forester worked for 11 days and billed The Elms $7,973.92 (including $773.92 in mileage); in April 1994, Forester worked for 12 days and billed The Elms $7,719.69 (including $519.69 in mileage and parking); in May 1994, Forester worked for 6 days and billed The Elms $3,925.37 (including $325.37 in mileage and expenses); in June 1994, Forester worked for 11 days and billed The Elms $8,518.93 (including $718.93 in mileage and expenses); and in July 1994, Forester worked for 13 days and billed The Elms $8,518.93 (including $600.67 in mileage and expenses). (App.480–540.) All of the invoices were duly paid by The Elms.

Forester argues in his brief that just because he was showing up at The Elms and earning money does not mean that he was actually capable of performing the duties of his occupation. Forester claims that the testimony of Robert Boland and David Boland creates a genuine issue of material fact as to whether Forester was actually capable of performing his work duties. Robert Boland is the CEO of Pavco, Inc., the company owning The Elms. (App.576.) As Forester notes in his brief, Boland stated at his deposition that he was "unhappy with what [he] got for [his] money" with respect to Forester's work on The Elms project. Boland also commented, as Forester points out, that "[Forester] had the ability to do it, he just wasn't doing it." (App.580.)

However, Boland also testified that Forester was a "key executive" in his companies and that Forester afforded benefits to his

**3.** All references to App. are references to the "Appendix to Revere's Motion for Summary Judgment."

companies. (App.568.) Boland stated that Forester gave it "a good college try."

> The things he did, we incorporated some of it, we didn't incorporate some of it. Some of it worked well for us. The refinancing package, I thought was very good. It was something that I could not get done .... [Forester] facilitated that. He knew how to push them and where to push them, and he had that experience from his own borrowing in the past.

(App.574.) Boland stated that he knew Forester was under stress, but "he seemed to handle it fairly well." (App.575.) Boland did not feel like stress was affecting Forester's performance. (App. 575.) In fact, Boland stated that Forester accomplished enough work to satisfy him up until the time his agreement with The Elms was terminated. (App.577.)

David Boland, the son of Robert Boland, was the Project Manager of The Elms during 1994. (App.587–88.) David Boland testified that Forester worked two or three days a week and helped train David Boland. (App. 588.) According to David Boland, Forester met with architects, engineers, lawyers, bankers, and tax appraisers (App.590); he oversaw plans for future development, tax and real estate policy matters (App.588); he was involved in loan refinancing negotiations (App.590); he was the contact person with the Home Owners' Association (App.591); he drafted memos, spreadsheets, and bank proposals; and he had regular business dinners with David Boland (App.589–90). Although Forester did not live up to the expectations that were held of him at his hiring, David Boland stated that Forester was "okay" as a general manager. (App. 598–99.)

Forester's own testimony is consistent with the Bolands and indicates that Forester was performing the duties of his occupation during the relevant time period. In early 1994, Forester's work with The Elms was "[n]ot much different from anything else we

had been doing." (App.621.) Forester stated that during that time (January through April 1994)

> I was simply running the project. I don't know of anything—I don't know of anything unusual during that period of time that was out of the course of business.

(App.621.)

Forester testified that he drove himself from Charlotte to Charleston and back each time. (App.621.) Forester met with architects, professional engineers, attorneys and "lots of bankers." (App.629.) Forester worked out an agreement with the banks to fund certain amenities with the projects. (App.623.) He spent a lot of time with David Boland teaching him how to be a project manager. (App.629.)

In July 1994, Forester suggested to Robert Boland that Forester increase the amount of work he was doing at The Elms. (App.628, 1155.) However, it became apparent that Forester and Boland had a difference in philosophy concerning management. (App.623–24.) Forester testified that:

> My feelings were that [Boland] was not performing according to the agreements with the banks that we had orchestrated, and that called for various specific things to be done. All of those things were being delayed by Bud, even though the banks were funding them, but the funds were going into other areas. And therefore, you could not accomplish that which we wanted to accomplish, in my opinion, with that.

(App.623–24.) Forester "felt like it was time for me to move on because I'm not going to win that kind of argument." (App.624.)

The court believes that the testimony of Forester, Robert Boland and David Boland, along with the invoices and other documentary evidence, establish that Forester was capable of performing, and was actually performing, the duties of his regular occupation during the relevant time period.[4] It may

---

4. The court notes that there is additional testimony from Forester's co-workers at The Elms which establishes that Forester was capable of performing the duties of his regular occupation during the relevant time period. *See* deposition testimony of Johnnie Avant, the on-site builder for The Elms, at 582–85 (Forester met with architects

"and was very competent in my opinion"; Forester was "confident and positive"; Avant never noticed anything "odd or unusual about him"; Forester was a "professional" who "diligently perform[ed] his job duties"; Forester "could function normally like you or I would") and deposition testimony of Wendale Goldstone, a

very well be that Forester was severely depressed during the relevant time period. However, similar to the plaintiff in *Kunstenaar*, Forester "confuses illness with total disability." 902 F.2d at 183. The fact that Forester was ill does not establish that he was disabled under the waiver of premium provision. Rather, Forester must prove that he was incapable of performing the duties of his regular occupation during the relevant time period.

Here, Forester simply cannot show that for a continuous ninety-day period, including April 21, 1994, he was incapable of performing the duties of his occupation. The record conclusively establishes that Forester worked full eight hour days at The Elms on April 12–14, 1994, April 20–22, 1994, and April 27–29, 1994. (App.496–99.) For each of these days, Forester received $600.00 in compensation. *See Fair*, 247 N.C. at 141, 100 S.E.2d at 378 ("Her work record is a stubborn fact that flinches not . . . .").

Contrary to Forester's assertions, the court does not believe a genuine issue of material fact is created by Robert Boland's isolated statement that he was "unhappy with what [he] got for [his] money" or by David Boland's statement that Forester did not live up to The Elm's expectations of him. A thorough review of Robert Boland's and David Boland's testimony reveals that while the Bolands may have been displeased with the ultimate results of Forester's work performance, they both acknowledged that Forester completed a satisfactory amount of work while at The Elms. Indeed, all of Forester's invoices were paid without question. Moreover, neither Robert Boland nor David Boland indicated that they believed Forester was incapable of performing the duties of his occupation. In fact, Robert Boland stated that Forester handled his stress "fairly well" and that he did not feel like stress was affecting Forester's performance. (App.575.) David Boland stated that he learned from Forester and that Forester was an "okay" general manager. (App.592, 598–99.)

As the North Carolina Court of Appeals stated in *Taylor*, "where a plaintiff is actually working and performing his duties, he is not entitled to benefits under disability insurance and this applies even where there is expert testimony to the effect that plaintiff is disabled." 14 N.C.App. at 422, 188 S.E.2d at 731. Here, the court cannot escape the conclusion that despite Forester's depression, Forester was actually working and performing his duties during April 1994. Forester has failed to come forward with sufficient evidence to the contrary. Consequently, the court concludes that Forester cannot establish that for a consecutive period of ninety-days, including April 21, 1994, he was incapable of performing the duties of his regular occupation.

Forester argues that his work at The Elms does not establish that he was capable of performing the duties of his regular occupation because his "regular occupation" consisted of many more duties than those that he performed during the relevant time period. The court believes this argument is unavailing in light of the evidence concerning Forester's pre–1994 work record. The evidence before the court indicates that Forester began working for The Elms in July 1993. Forester's invoices to The Elms from July 1993 to December 1993 were as follows: July 1993—$6,572; August 1993—$8,992; September 1993—$7,308; October 1993—$7,169; November 1993 — $7,874; December 1993—$8,557. (Tab A to Paul Revere's reply memorandum (invoices include mileage and expenses).) The amount of work billed on these invoices is comparable to the amount of work billed by Forester between January and July 1994. *See supra* at 357. Thus, it appears that Forester was working approximately the same amount of time for The Elms in 1993 as he worked for The Elms during the relevant time period.

The court also notes that there is evidence that Forester performed additional work during the relevant time period other than that which he performed for The Elms. Forester was President of The Great Turnip &

---

sales agent for The Elms, at 602–06 (Forester was "always busy"; he "worked long hours"; although Goldstone stated she didn't believe For-

ester "had really grasped the concept of our typical customer," she stated that Forester "was fine"; "I mean he—he was working.")

Pea Entertainment Company, FRI Realty, and Denver Development Company in 1994. (App.611–12.) He signed many checks in his capacity as President of these companies between January 1994 and July 1994. (App. 1231–75.) He also drafted and signed numerous items of business correspondence, memoranda and notes during this time period. (App.1023–1225.) Forester negotiated with buyers and creditors (App.1039, 1064); he participated in a decision by one of his restaurant's to file for Chapter 11 bankruptcy (App.1148); he hired employees (App. 1025, 1035, 1051, 1117); and he wrote to subordinates insisting that they follow certain business practices. (App.1036.) In October 1994, Forester represented that his 1994 earned income was $126,000.00. (App. 783, 1278.)

Thus, the evidence establishes Forester engaged in a significant amount of work activity during the relevant time period in addition to his consulting work with The Elms. In light of this evidence, and in light of the fact that Forester's work schedule at The Elms during the relevant time period was comparable to his work schedule at The Elms during 1993, the court concludes that Forester cannot prove that for a period of ninety consecutive days, including April 21, 1994, Forester was unable to perform the duties of his regular occupation. Consequently, Policy A lapsed upon Forester's failure to pay his April 1994 premium, and Revere is entitled to summary judgment on Forester's counterclaims relating to Policy A.

### D. Forester's Motion to Amend

Forester has moved to amend his counterclaim in the following manner: (1) Forester seeks to amend his first counterclaim to allege entitlement to benefit payments under Policy A from February 1995, rather than May 1995; (2) Forester proposes a third counterclaim, which seeks recovery of benefits under Policy B from February 1, 1995 to May 1995; and (3) Forester proposes a fifth counterclaim, which seeks a refund of the premium submitted with the reinstatement application.

■ Federal Rule of Civil Procedure 15(a) provides that leave to amend a pleading

"shall be freely given when justice so requires." The decision to grant or deny leave to amend a pleading is within the trial court's sound discretion. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Courts have routinely held that leave to amend need not be granted when the proposed amendments are subject to dismissal, since such amendments would be futile. *See, e.g., Perkins v. Silverstein,* 939 F.2d 463, 472 (7th Cir.1991). Moreover, courts have subjected motions to amend that are filed close to trial to special scrutiny. *Deasy v. Hill,* 833 F.2d 38, 41 (4th Cir.1987), *cert. denied,* 485 U.S. 977, 108 S.Ct. 1271, 99 L.Ed.2d 483 (1988).

■ In the present case, the court believes that Plaintiff's request to amend his first counterclaim should be denied on the basis of futility. Plaintiff seeks to amend the first counterclaim to allege entitlement to disability benefits under Policy A from February 1995. However, the court has already determined that Forester is entitled to no benefits under Policy A because such policy lapsed due to Forester's failure to pay his insurance premium. Because Forester cannot recover any benefits under Policy A, the proposed amendment is futile and will be denied.

■ Forester's proposed third counterclaim seeks to recover disability benefits under Policy B for the period dating from February 1, 1995 to May 1, 1995. While this claim involves a cause of action under a separate insurance policy, the court does not believe that allowing the amendment would prejudice Revere. The definition of disability under Policy B is similar to the definition under Policy A. Discovery has been conducted on Policy B. In fact, Revere admitted in May 1998 that "this action does place at issue policy [B]." (Exh. C. to Forester's reply to motion to amend.)

Because allowing the proposed third counterclaim will not prejudice Revere, the amendment will be allowed. However, it appears that Revere should be afforded a period of time to evaluate Forester's entitlement to disability benefits under Policy B and file a motion for summary judgment on the claim if it sees that such a motion has merit. While Revere appears to argue in its re-

sponse to the motion to amend that it would be entitled to summary judgment on the proposed third counterclaim, the court does not believe the issue is adequately briefed and ripe for disposition at this time. The court will therefore grant Revere until January 15, 1999 to file a motion for summary judgment with respect to the third counterclaim. Prior to filing any such motion, however, counsel for Revere and Forester shall confer and discuss the prospects of settlement on the third counterclaim.

Since Revere has until mid-January to file a motion for summary judgment on the only issue remaining in this case, it will be impossible to try that issue in February 1999 as scheduled. Hence, the court will, once again, move the trial of this action to the court's civil term beginning March 29, 1999.

Finally, with respect to the proposed fifth counterclaim, the court notes that it has already determined that the reinstatement application should be rescinded and that Forester should receive a refund of the premiums submitted with his reinstatement application. *See supra* at 354. Because Forester's fifth counterclaim seeks the exact relief that this court has determined Forester is entitled to receive, the proposed fifth counterclaim will be allowed.

## III. Conclusion

Based on the foregoing reasons, it is hereby **ORDERED** that Forester's motion for partial summary judgment is **GRANTED**; Revere's motion for summary judgment is **GRANTED**; and Forester's motion to amend is **PARTIALLY GRANTED and PARTIALLY DENIED.** Forester's proposed fifth counterclaim is allowed and Forester is **GRANTED** summary judgment on this claim. Forester is **GRANTED** permission to add its proposed third counterclaim. Revere is **GRANTED** summary judgment on Forester's first and second counterclaims and Revere's declaratory judgment claim is **GRANTED**. The trial of this action is continued to the court's civil term beginning March 29, 1999.